## BRYANT et al. v. COMMISSIONER OF INTERNAL REVENUE.
### No. 231.

Circuit Court of Appeals, Second Circuit.
March 18, 1935.

Sidney S. Bobbe, of New York City, for appellants.

Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and Joseph M. Jones, Sp. Assts. to Atty. Gen., for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The appellants are administratrices of one Marion G. Thompson, who was the daughter of Patrick H. Gilhooly, and upon whose income tax, as returned for the year 1928, the Board has assessed a deficiency. This arose because of a supposed gain realized by Marion G. Thompson in that year from her disposal of the assets of her father's estate, of which she and her two sisters were the residuary legatees. One Bender had been Gilhooly's executor and in control of his estate from 1918 when Gilhooly died until 1928 when the three daughters transferred to him all their interest in the estate for the sum of $378,000, payment of which was to be spread over the years 1928, 1929 and 1930. In the year 1928 the sum of $50,000 was paid, of which the taxpayers' intestate was entitled to $16,667. The Commissioner found that Gilhooly was insolvent at his death, July 28, 1918, and that the sum collected from Bender in 1928—less an allowance of about one-third as expense of collection—was taxable as gain when paid to the three legatees. The taxpayers do not dispute the propriety of treating as income any appreciation of the property during the ten years in question; but they challenge the correctness of the finding that the estate had no value or was insolvent in 1918, and of the failure to eliminate certain items included in the settlement, which they say were the property of Gilhooly's wife and daughter. We accept the issue as drawn, without considering whether the appreciation of a decedent's estate as a whole between death and disposition by the residuary legatees is a gain taxable to them as such.

The record is rarely unsatisfactory, and it was for this reason that the Board refused to reduce the deficiency. The chief testimony was of an accountant who had audited the books of Gilhooly at the request of the taxpayers' lawyer. Since no objection was made to the use of these books we shall treat them as competent, so far as anything can be safely gathered from them. Thus, we accept the accountant's conclusion that the settlement included property of the wife and daughter, consisting of a mortgage, $21,460.53, some Liberty Bonds, $10,000, and a loan, $12,000, making in all $43,460.53. This should have been deducted from the payment, and one-third of the difference, or whatever proportion the Commissioner concedes, should have been allowed as an expense. On the other hand the testimony that Gilhooly's earnings from December 17, 1917, to his death were $12,000, does not enable us to say how much of that sum was still in hand when he died, or that any part of it was. It was right to disregard this item. The same is true of the "goodwill" of the business which the accountant appraised at $100,000. All we know about this is that Gilhooly had for forty years been engaged in lending money on mortgage for "estates." He had had a large business which brought him in $25,000 yearly, gathered for the most part from fees charged to borrowers. In the course of time he had accumulated a large "title plant," by which we understand a number of searches of real estate titles and other similar papers, affecting land in New Jersey where he lived and did business. The appraisal was on the basis of a four years' purchase, though nobody suggested that there had been any possible buyer for such property. Although Bender had never been Gilhooly's partner, he kept up the business successfully for at least a year; but it does not follow that without his continued assistance it would have had any sale value on July 28, 1918, or at any time; it might have been unsalable for anything but waste paper. Especially in 1918 when so much money lending on mortgage had been taken over by mortgage and title companies, it would be the merest speculation to give it a value after his death. For all we can know his income was entirely due to his character and sagacity which died with him. Nor do we understand on what theory the accountant's report, drawn from the books, of a value—about $10,000—of the business in December, 1917, can have any significance. Though the books be competent as evidence of the facts recorded, the valuation they contained of property in the business could at most be no more than the testator's opinion, except as it might represent cost, and if it did, cost is not value. Besides even if the report were evidence of value for December, it was none for July, for it is impossible to guess how much remained at the end of seven months. So far, it seems to us therefore that the Board was right except in including the property of the wife and daughter.

■■ There remains the real estate, consisting of forty parcels situated in New Jersey. To show the value of this the taxpayers called two witnesses familiar with the values of neighboring real property, who swore to a written appraisal of each parcel contained on a list prepared by them. The figures represented their opinion of the values of the several pieces; one total was $61,703.67; the other, $63,815. The Board threw out this testimony altogether, though the Commissioner did not attempt to meet it. Their reasons were that the valuation was "retrospective," and that the witnesses did not speak in enough detail. Neither reason is good, the first being obviously unsound. As to the second, once the witnesses had qualified as experts, it was for the Commissioner or for the trial member of the Board to bring out the details; the opinions were competent as they stood, and the taxpayers were not bound to go further. Nevertheless the situation brings up a mooted question in proceedings before the Board which we cannot disregard. In Bonwit-Teller v. Commissioner, 53 F.(2d) 381, 82 A. L. R. 325, we refused to accept a finding of the Board fixing the valuation of a lease at only one half what the taxpayer's expert had given, though we recognized that the amount sworn to was not conclusive. In Uncasville Mfg. Co. v. Com'r, 55 F.(2d) 893, we considered how far the Board was bound by opinion evidence given by an interested witness, and decided that it was not bound at all. Very recently in Dayton P. & L. Co. v. Public Utilities Commission, 292 U. S. 290, 299, 54 S. Ct. 647, 78 L. Ed. 1267—a rate case—the Supreme Court held the uncontradicted opinions of expert witnesses were not conclusive. It is true that there too the witnesses were thought to have a bias, but we do not read the case as turning alone upon that. The language used is general and presupposes that, as is usual in our system of law, the weight of any evidence is to be determined by the tribunal charged with a decision on the facts. But it does not follow because the Board need not accept the experts' opinions, that it might refuse to give the property any value whatever. Both these witnesses swore that the realty was worth over $60,000; it seems to us to be beyond reason and arbitrary to throw it out of the account entirely. In such cases though it be impossible to reach

a certain conclusion, it has been several times held that the Board should exercise a sound judgment, though taking all chances against the taxpayer. Cohan v. Com'r, 39 F.(2d) 540 (C. C. A. 2); Conrad & Co. v. Com'r, 50 F.(2d) 576 (C. C. A. 1); Sioux City Stockyards Co. v. Com'r, 59 F.(2d) 944 (C. C. A. 8); Davison v. Com'r, 60 F.(2d) 50 (C. C. A. 2). We are quite aware that the result will be speculative, but the Treasury will be protected and some relief is juster than the denial of all.

■ The Commissioner's evidence as to the insolvency of the estate on Gilhooly's death was even more meagre. It consisted only of the testimony of the accountant that the Court of Chancery of New Jersey had so found. He so testified over objection and the objection was apparently good. Immediately thereafter he said that this was found only in the opinion of the court. No conclusion can be based upon such nebulous talk. True, if the estate really was insolvent the extent of the insolvency might be important, for the debts would pro tanto set off any value of the real property; and as the case must in any event go back for another hearing, this point may come up on a different showing. But on this record the proper calculation would have been to subtract from the amount of the settlement, $378,000, the items not constituting any part of the estate, $43,460.63, leaving $334,539.37. From this a third should have been deducted for expenses of collection, leaving $223,026.24 as the "amount realized." The value put upon the real property should have been used as a "basis," i. e., subtrahend, and the gain would have been the difference. The question has not been argued before us as to which of the three payments of 1928, 1929 and 1930 should bear the repayments of the wife's and daughter's property, or how the allowance for the real property should be marshalled. Nor do we say how the allowance of one-third for expenses shall be distributed between the payments. All we decide now is that it was erroneous not to deduct the property of the wife and daughter, and not to give any value to the real property. On the new hearing the case will be open to both sides de novo, and the Board will be free to dispose of the matter on such evidence as may then appear.

Order reversed; cause remanded.