See also 149 F.Supp. 568.

Abe BERNSTEIN; Morey Bernstein; Sam Bernstein; Bernstein Bros. Pipe and Machinery Company, a corporation; Maurice Levy; Rose Levy; Albert Bensik; and Modern Specialty Distributors, a partnership, Appellants,

v.

UNITED STATES of America,
Appellee.

UNITED STATES of America,
Cross-Appellant,

v.

Abe BERNSTEIN; Morey Bernstein; Sam Bernstein; Bernstein Bros. Pipe and Machinery Company, a corporation; Maurice Levy; Rose Levy; Albert Bensik; and Modern Specialty Distributors, a partnership, Cross-Appellees.

Nos. 5704, 5705.

United States Court of Appeals
Tenth Circuit.

May 23, 1958.

Rehearing Denied July 28, 1958.

Morrison Shafroth and Charles Rosenbaum, Denver, Colo., for appellants and cross-appellees.

Hershel Shanks, Washington, D. C. (Joseph D. Guilfoyle, Washington, D. C., Donald E. Kelley, Denver, Colo., and Morton Hollander, Washington, D. C., on brief), for cross-appellant and appellee.

Before BRATTON, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This is an appeal from a civil judgment in a suit by the United States against the appellants and others under the fraud provisions of the Surplus Property Act of 1944, 58 Stat. 765, 780, now Section 209(b), Federal Property and Administrative Services Act of 1949, 63 Stat. 377, 392, 40 U.S.C.A. § 489(b).

On the critical dates of the complaint, Section 26(b) of the 1944 Act provided in substance that every person who engages in any fraudulent scheme or device for the purpose of securing or obtaining any surplus property of the United States, or who agrees or conspires to do so, shall be liable to the United States for enumerated elective remedies. Jurisdiction of suits under the Act was vested in the United States. Section 26(c).

The trial court's judgment is based upon an ultimate finding to the effect that in the Fall of 1946, the appellants entered into an agreement or conspiracy to defraud the United States in connection with the sale of surplus property of the United States in San Antonio, Texas, by arranging to have war veteran Bensik, an employee of Bernstein Brothers, Inc., apply for a veteran's priority certificate for the purchase of the property in question, ostensibly in his own behalf, for use in his own business, but actually in behalf of and for the benefit of Bernstein Brothers, the purpose and object being to enable the Company to gain possession and control of priority surplus property which, for lack of such priority, it would not be entitled or eligible to obtain.

The underlying facts are that appellant, Bensik, a war veteran doing business as the Modern Specialty Distributors in Pueblo, Colorado, was distributing grave monuments and other odds and ends, including some reconditioned Stewart-Warner airplane heaters. Appellant, Bernstein Brothers Pipe and Machinery Company, is a large established retail and wholesale dealer in both new and used pipe and machinery in Pueblo. The individual appellants, Bernsteins, are officers and principal owners of the corporation. Appellant, Levy, is a brother-in-law of the corporation president, and General Sales Manager of the company. Bensik started working for the corporation as a salesman in February 1946 for $250 per month, but continued to conduct his own small business on the side. On October 20, 1946, Bensik made an application and was certified by the War Assets Administration in Denver, Colorado, for a veteran's priority to purchase $3,000 worth of gasoline engine compressors. In his application, he represented that no person other than himself had any proprietary interest in his enterprise in excess of fifty percent of the invested capital or of the gross profits or income thereof; that he was not a broker, and would not handle the surplus property as a broker; and was not purchasing the property for the use and benefit of any other enterprise, dealer, broker, merchant or other undisclosed partner or principal.

About the time of his application and certification for the engine compressors, the War Assets Administration offered 928 Herman Nelson airplane heaters and 3341 Stewart-Warner heaters for sale as surplus property in San Antonio, Texas. The property was offered concurrently to all priority groups, including World War veterans, and all levels of trade—all

priority groups to bid without price, awards to be made to priority groups at the lowest acceptable price. With notice of this offering, Bensik returned to the War Assets Administration office in Denver on November 18 or 19, and asked to be recertified for $25,000 worth of surplus property, including $20,000 worth of "heating and ventilating equipment and machinery—Texas". At the same time, he submitted a letter from a Pueblo bank stating that he was a legitimate dealer and wholesaler of equipment and supplies, and had on deposit with the bank at that time $25,000. The bank credit was arranged by appellant Levy, who gave the bank his personal check for $25,000 in exchange for a cashier's check for that amount "payable to ourselves" for Bensik's account. Previously, and on October 31, Bernstein Brothers issued its check to Levy for $21,532 in payment of his annual salary, less taxes, and Levy apparently financed the transaction with this check and another from Morey Bernstein in the sum of $7,500, which was never honored. In connection with his application for the recertification, Bensik submitted a grossly exaggerated financial statement in which he listed $28,000 in cash, evidently including the $25,000 bank credit represented by the cashier's check. He also certified in connection with this priority application that he had made necessary arrangements to become "an established dealer, jobber or distributor of the kind who customarily take into their possession and have full control for the purpose of reselling property of the kind covered by this order"; that he was not a broker and would not use the property ordered to operate as such; and that he would not engage in "drop sale" in his disposal of the property.

On the basis of these latter representations, Bensik's application was reviewed and he was recertified for the purchase of $20,000 worth of the heating and ventilating equipment as a specialty distributor. The original application was stamped "initial stock for resale".

On the next day after the last certification, the $25,000 cashier's check was redeposited to Levy's account. He thereupon issued a check to his wife for $20,000 and she secured a cashier's check for $20,000 "payable to the order of ourselves December 13, 1946". This check was left with the bank for Mr. Bensik. The check to Levy's wife (Bernstein's sister) was a loan to finance the Bensik transaction.

On December 10, Bensik was awarded 600 Herman Nelson heaters at a unit cost of $33.26, or a total sum of $19,-956. The awards were made on the basis of Bernstein Brothers' non-priority highest best bid on the whole offering of both the Herman Nelson and Stewart-Warner heaters. Bensik did not go to San Antonio and never examined the heaters before bid or purchase, but appellant, Sam Bernstein, was in San Antonio to bid on the heaters without priority. While there, Bernstein, in a chance conversation with a stranger, later discovered to be a bidding competitor, unwittingly stated that he was working through Mr. Bensik, and inquired whether the stranger "would be interested in purchasing for companies."

After the award of the heaters to Bensik, Sam Bernstein arranged to have them shipped to Bernstein Brothers warehouse in Pueblo and paid the freight. On December 13, 1946, three days after the award of the heaters to Bensik, and before arrival at the Bernstein Brothers warehouse, Rose Levy and Bensik entered into an agreement, by direction of her husband, Maurice Levy, under which Rose Levy agreed to loan Bensik $20,000, to be used for the purchase of the 600 heaters. It was agreed that the merchandise would be shipped to Pueblo and stored in the Bernstein warehouse; that Bensik would proceed to sell the heaters, and after payment of all charges, the proceeds would be applied toward the repayment of the $20,-000 loan, plus interest. The remainder of the proceeds were to be divided between the parties, forty-five percent to

Levy and fifty-five percent to Bensik. It was agreed that all of the proceeds from the sale would be placed in an account known as the Levy-Bensik special account, and that all checks written on such account would be signed by both parties. It was to be distinctly understood that the parties did not intend by their agreement to constitute a partnership, but that the moneys provided to be paid to Levy over and above the loan should merely constitute "interest and return on the said loan." Bensik executed his note to Rose Levy for the $20,000 loan. The $20,000 cashier's check was thereupon deposited in a new account for the Modern Specialty Distributors, and a check was drawn on this account by Bensik to the Treasurer of the United States in payment of the heaters previously awarded to him.

On December 24, and before arrival of the merchandise in Pueblo, Bensik formally agreed in writing to sell Bernstein Brothers 510 of the heaters at $35 each f. o. b. San Antonio, payment to be made as delivery to the Bernstein warehouse was completed. The 510 heaters were duly transferred to Bernstein Brothers for a profit of $1.74 per unit to Levy and Bensik, netting Bensik $488.70. Bernstein Brothers finally sold the 510 heaters for a gross price of $141,154.24, or an average price of $276 each. Bensik advertised and eventually sold the remaining 90 heaters for a total profit of $24,000, which he divided with Rose Levy in accordance with their contract.

During this time, Bensik purchased from Bernstein Brothers the smaller and less expensive Stewart-Warner heaters for $125 each and resold them for $195, and the government emphasizes this disparity in purchase and sale of heaters as evidence of the lack of the bona fides of the whole transaction.

■ The property in question was awarded to Bensik on the basis of his veteran's priority, for which Bernstein Brothers was ineligible. And, it would undoubtedly be contrary to the spirit and purpose of the Surplus Property Act and actionably wrong, to use Bensik's priority to obtain the property on behalf and for the benefit of Bernstein Brothers. Rex Trailer Co. v. United States, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149; Daniel v. United States, 5 Cir., 234 F.2d 102. Indeed, the gist of the government's claim is that the parties conspired to use Bensik's priority to secure or obtain property for Bernstein Brothers. But appellants earnestly insist that Bensik purchased the property in his own right for his own account; that the subsequent sale of a major portion of it to Bernstein Brothers was not prohibited by any applicable regulation, and was moreover with the knowledge and tacit consent of the War Assets Administration. In other words, the sale was "real and not a sham", hence without fraud or actionable wrongdoing.

■ No one seems to contend that any applicable regulation forbade the resale of the property to whomsoever Bensik chose. Nor are there any inhibitions against veterans having nonveteran partners in small business enterprises, so long as the veterans are not mere fronts. See Lee v. United States, 6 Cir., 167 F. 2d 137. Nor do we think the representations made for the first certification pertinent to the later certification for the property in question. The first priority was for the veteran's own use, not for resale. The second priority was for property intended for resale and the latter representation superseded the former and is relevant to the challenged transaction. Therein Bensik certified in effect that he was an established dealer, jobber or distributor, purchasing for resale; that he was not a broker and would not use the property ordered to operate as such—in other words, that he was not acting as the agent of an undisclosed principal who was ineligible to purchase the property on a veteran's priority.

On December 10 (the date of the award to Bensik) Morey Bernstein wrote to the representative of the War Assets Administration in Denver who had cer-

tified Bensik's priority, confirming a telephone conversation on November 20 (the day after certification), wherein Bernstein had inquired whether, in the event Bensik's bid was successful, it would be satisfactory for Bensik, the sole owner of Modern Specialty Distributors and a salesman for Bernstein Brothers, to sell Bernstein Brothers a substantial portion of the material purchased, so long as he distributed the remainder among several different buyers. The letter indicated that the representative of the War Assets Administration had replied that in his opinion, there was no objection to this procedure. Three days later, however, the Chief of the Veterans' Division of the War Assets Administration in Denver, replying to Bernstein's letter, stated that "while Bensik is the man who should make the decision regarding the customers he serves", for his protection, and in view of the connection between Bensik and Bernstein Brothers, Bensik should contact the Office of the Regional Counsel for the War Assets Administration. On December 18, Bensik wrote to the Regional Counsel, stating that he was the owner and operator of the Modern Specialty Distributors and a salesman for Bernstein Brothers; that he had sold portable heaters before the San Antonio purchase; that he was definitely not acting as a broker; that "Bernstein Brothers merely want to purchase a lot of these heaters from me, but they are extremely careful and wanted to advise you of their action." The Regional Counsel replied in part that "in your case, this office considers it definitely inadvisable for you to sell any part of the material which you purchased to a firm by which you are employed, inasmuch as the transaction would lead to the conclusion that you might merely be acting as agent of that firm in the purchase of surplus property."

While this correspondence did generally advise the War Assets Administration that Bensik planned to sell a major portion of the property to Bernstein Brothers, it also served to advise the appellants that in the circumstances, the transaction smacked of an illegal agency. The first letter of December 10, reflecting the telephone conversation of November 20, left no doubt that from the very inception of the transaction, Bernstein Brothers intended to acquire the major portion of the heaters to be awarded to Bensik under his veteran's priority. In any event, there was nothing in the correspondence to indicate that the appellants relied upon statements contained in the government letters, or that they were deceived or misled in any way. In determining in the last analysis whether Bensik purchased the heaters for his own account as an established dealer for resale, or as a mere broker or agent for Bernstein Brothers, it is significant to note that the gains he realized from the 510 heaters is more like a broker's commission than an established dealer's legitimate profit.

When the evidence is considered in its entirety, we are certainly unable to say that the inferences which the trial court drew from the established facts were unwarranted, and that its judgment thereon is clearly erroneous.

■ Invoking the rule in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, appellants complain of the refusal of the trial court to require the government to produce for purposes of impeachment on cross-examination, a report of a government witness made and submitted to the War Assets Administration in connection with his investigation of this case. Witness Poyen did make a report of his investigation in February 1947, and he did refresh his memory from it while testifying as a government witness.

■■ Simple justice and fundamental fairness becoming the sovereign require it to make available to the accused any matter from which its witnesses testify, if such testimony is material and the credibility of the witness in respect thereto is attacked, and proper founda-

tion is laid for impeachment. See Jencks v. United States, supra; Communist Party of United States v. Subversive Activities Control Board, 102 U.S.App.D.C. 395, 254 F.2d 314. The operative facts in this case occurred in 1946; the case was filed in 1951, and tried in 1956. On pre-trial the court denied appellant's motion for the production of the Poyen report under Rule 34, Fed.Rules Civ.Proc. 28 U.S.C.A. Certainly if the report was relevant and not privileged for security reasons, see United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727; or as "an attorney's mental impression, conclusions, opinions or legal theories", it was a proper subject for production and inspection under Rule 34 for good cause. See Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451. And, it was undoubtedly subject to production and inspection during trial for impeachment purposes if there was any material testimony to impeach.

On direct examination, witness Poyen testified that he went to Pueblo in 1947 to investigate the case for the War Assets Administration; that he contacted appellant Bensik at Bernstein Brothers Pipe and Machinery Company; that Bensik told him he had been working for Bernstein Brothers about six months for about $300 per month; that Bensik took him to his home in Pueblo and showed him a mock-up of a circular he proposed to distribute throughout the country for the promotion and sale of the heaters. When asked if he recalled the substance of the mock-up for the circular, he answered, "well, having refreshed by memory from my report, I can report on it reasonably accurately." Then he proceeded to state the kind of heaters and the price at which they were to be sold, and other details of the proposed circular. The witness went on to state that in answer to questions, Bensik told him he had sold 510 of the heaters to Bernstein Brothers for $35 each under the written contract of December 24, 1946. He further testified that Bensik told him the 90 heaters he proposed to sell were in Bernstein Brothers warehouse; that he had paid for all 600 of the heaters with a check for the full amount on the Modern Specialty Distributors. When asked how he had been financed, he refused to answer or give any information. The witness went on to state that almost immediately after filing his report with the Enforcement Division of the War Assets Administration in Denver, he entered the private practice of law, and that soon thereafter Morey Bernstein called him on the telephone to inquire whether he might be available to act as his attorney in a case, and that he told him he would be unable to do so. When the witness was unable to recall the details of the conversation, government counsel claimed complete surprise, but abandoned further interrogation on that point. He then related a conversation with appellant Levy in the witness's law office. Levy wanted to know the status of the case, and whether in his investigation he had gotten information he needed. The witness advised him that he had completed his investigation, was in the private practice of law, and could not discuss it with him; and they then discussed his retention as an attorney for Bernstein Brothers, Mr. Levy saying that the fees were immaterial.

At this point, counsel for appellants made demand on the government to produce the report made by the witness to the government. The government objected on the grounds that no proper foundation had been laid, the government having abandoned "that line of questioning * * *." The court took the view that since counsel's objection to the witness's testimony based on the report had in the main been sustained, its production was not required unless cross-examination developed something that would entitle the appellants to see some part of the report. Counsel for appellants sought production of the report for impeachment purposes, and on the further ground that "throughout the examination the attorney for the government was constantly referring to this report."

The decisive fact is that witness Poyen testified to nothing from his report, ei-

ther on direct or cross-examination, that is disputed now or at the time of trial. His only disputed testimony concerned conversations with Bernstein and Levy, held after he had submitted his report and left the service of the government. In short, there was nothing in his testimony to impeach by reference to the report. We therefore hold that fundamental fairness exemplified in Jencks does not require a reversal of the court's ruling.

■ Finally, appellants complain of the refusal of the court to permit appellant Levy to testify concerning advice of counsel on the validity of the Bensik-Levy contract, under which Levy's wife advanced the funds to purchase the heaters. Advice of counsel is invoked to show lack of fraudulent intent. Levy was permitted to testify that his attorney drew the Bensik-Levy contract on information given him by the parties, but the court refused to permit him to testify concerning advice of counsel on the validity of the contract.

■ Generally, where, as here, fraud is an essential element of the charge, the accused may testify not only that he had no such intent, but he may buttress his statement by proof of conversations with other persons tending to support his statement. Frank v. United States, 10 Cir., 220 F.2d 559; Haigler v. United States, 10 Cir., 172 F.2d 986; Miller v. United States, 10 Cir., 120 F.2d 968. The gravamen of this charge is, however, not the validity of the Bensik-Levy contract. Instead, it is an arrangement between the appellants, whereby Bensik used his veteran's priority to obtain government surplus property in behalf of and for the use and benefit of Bernstein Brothers. There was no testimony or offer of proof indicating that advice of counsel was sought or given concerning the legality of this particular arrangement. And see McDonald v. United States, 10 Cir., 246 F.2d 727.

## Cross-Appeal

■ The United States has appealed from that part of the judgment which puts it to an election of statutory remedies under Section 26(b) of the Surplus Property Act of 1944, supra. Section 26(b) provided that any person who shall engage in a scheme or device condemned in this Section "(1) shall pay to the United States the sum of $2,000 for each such act, and double the amount of any damage which the United States may have sustained by reason thereof, together with the cost of suit; or (2) shall, if the United States shall so elect, pay to the United States, as liquidated damages, a sum equal to twice the consideration agreed to be given by the United States or any Federal agency to such person or by such person to the United States or any Federal agency, as the case may be; or (3) shall, if the United States shall so elect, restore to the United States the money or property thus secured and obtained and the United States shall retain as liquidated damages any property, money, or other consideration given to the United States or any Federal agency for such money or property, as the case may be." The remedies thus provided are "in addition to all other criminal penalty and civil remedies provided by law." Section 26 (d).

In its original complaint, filed in February 1950, the government prayed for twice the consideration paid the United States for the surplus property, in the amount of $39,912. In October, the government moved to amend, alleging that since the filing of the original complaint, it had come to the attention of the Department of Justice that the Bernsteins had made a large profit from the sale of the heaters alleged to have been fraudulently acquired by them; and that if the charges in the complaint were established, the Bernsteins would be liable to the government for the profits, thus greatly enhancing the amount to be recovered. In January 1952, an amended complaint was filed, in which the government sought restoration of the merchandise, or damages in the amount of the proceeds of the sale by the Bernsteins. And, it also reiterated its prayer for

twice the consideration paid the government for the merchandise.

After answer to this complaint was filed, and pursuant to leave granted, the government again amended its complaint in April 1954 to pray in the alternative for (1) restoration of the property or the cash proceeds of its sale; (2) twice the consideration paid for the merchandise as originally demanded; and (3) or $2,000 plus twice the amount of damages which the government might have sustained in the sale.

In their answer to the last amended complaint, the appellants moved to compel the government to elect its remedy in accordance with the original complaint, viz., twice the amount of the consideration paid the government for the merchandise. This motion was denied in March 1955, but the government was ordered to elect which of the three remedies it would seek. The government thereupon elected to demand restoration of the property or the proceeds of the sale thereof, less the amount paid the government, together with interest and costs. In an amended answer to the last amended complaint and election filed February 27, 1956, appellants pleaded as a defense the election made in the government's original complaint to demand twice the consideration paid for the merchandise.

■ The trial court assumed the availability of equitable restitution as an additional remedy "provided by law" under Section 26(d). And, we have no doubt of it. The court took the view, however, that the government was bound by its original election to affirm the transaction and seek twice the amount of the purchase price of the merchandise. In so doing, it applied the common law doctrine of election of remedies, according to which an aggrieved party with a cognizant choice of two or more remedies for inconsistent rights growing out of the same transaction, must elect one of the remedies to the exclusion of the others. See 18 Am.Jur. Election of Remedies, § 3, p. 129; Kuhl v. Hayes, 10 Cir., 212 F.2d 37. "The doctrine of election

of remedies is not a rule of substantive law. It is a rule of procedure or judicial administration. It is technical * * *". See Brandeis dissenting in United States v. Oregon Lumber Co., 260 U.S. 290, 304, 43 S.Ct. 100, 104, 67 L.Ed. 261. It has been consistently criticized as harsh and not a favorite of equity. See Oil Well Supply Co. v. First National Bank of Winfield, 10 Cir., 106 F.2d 399. It has been applied to suits by the government with caution. Goldstein v. United States, 8 Cir., 227 F.2d 1.

The trial court recognized that ordinarily an original complaint will not constitute an election precluding a prayer for an inconsistent remedy in an amendment. But the court was nevertheless constrained to enforce the election made in the original complaint because, if the doctrine is "not applicable here, it would be hard to conceive of an instance where it would be" for, said the court, the government "positively stated in its original complaint that it was making and asserting its election", and in so doing, it affirmed the sale to Bensik by seeking liquidated damages as provided in the statute, and having done so, it should not thereafter be permitted to elect to disaffirm the transaction by seeking restitution. The court observed that the government was undoubtedly apprised of the profits the Bernsteins were making on the resale of the heaters, the evidence showing that prior to the filing of the complaint, they had sold sixty-nine percent of the heaters and parts for $96,-677.28, and that between the first complaint and the first amendment in 1951, they had sold $10,935 more, and thereafter $33,541.96; that the last heater was sold in March, and the final election was made in the following April. From this the trial court reasoned that the election the government made in April 1955 could very well have been made upon the filing of the first complaint in 1950. The court finally concluded that the appellants "should not be penalized for failing to guess which mode of relief the government would finally adopt, and during the entire period curtail their

business and sell slow-moving merchandise accordingly." The court found ample evidence of damage to the appellants upon which the doctrine of election of remedies should rest.

 Whatever may be said for the common law doctrine of election of remedies before the advent of the Federal Rules of Civil Procedure, we are certain that there is no room for its application under applicable rules of procedure, according to which every pleading is a simple, concise statement of the operative facts on which relief can be granted on any sustainable legal theory "regardless of consistency, and whether based on legal or on equitable grounds or on both"; Rule 8(e) (1) (2) F.R.Civ. P., and, where the prayer or demand for relief is no part of the claim and the dimensions of the lawsuit are measured by what is proven. Western Machinery Co. v. Consolidated Uranium Mines, 10 Cir., 247 F.2d 685; Gins v. Mauser Plumbing Supply Co., 2 Cir., 148 F.2d 974. When the complaint is judged in the context of the philosophy of these modern procedural concepts, we are convinced that the election of remedies is inapplicable here.

While the court applied the election of remedies with controlling effect, it seemingly weighed the equities as in restitution, and resolved them against the government. In any event, it found equitable grounds for holding the government to its original election. But judging the measure of relief to be granted under equitable restitution, we do not think the equities weigh in appellants' favor. In its motion to amend, filed in July 1951, the government alleged that it had been apprised of the fact that the Bernsteins had made a large profit on the sale of the heaters, and that if fraud was established, they would be liable for such profits. On this basis, leave was granted to amend to demand restoration or restitution. And, the trial court denied appellants' motion to require the government to stand upon its original demand. When the court required the government to elect one of its available remedies, it finally demanded restoration or restitution. The original demand or election was pleaded as a defense. The record shows that sixty-nine percent of the merchandise was sold prior to the original complaint, and that most of the remainder of the merchandise was sold after notice was given of the government's intention to pursue its remedy in restitution. It cannot be said that the appellants proceeded in reliance upon the government's original election. Moreover, the appellants have no standing in equity to plead that their fraudulent pursuits would have been deterred by the severity of the penalty. We conclude that equitable restitution was available to the government.

The judgment on the appeal is affirmed, and the judgment on the cross-appeal is reversed, with directions to grant restitution.