**DAVIS & RANDALL, INC. and National Motor Freight Traffic Association, Inc., Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 9118.**

United States District Court
W. D. New York.

June 28, 1963.

---

13. See Wong Sun v. United States, 371 U.S. 471 at p. 485, 83 S.Ct. 407 at p. 416, et seq.

Donald E. Cross, Thomas M. Knebel, Washington, D. C. (Williams & Sawyer, Buffalo, N. Y., Watkins & Rea, Washington, D. C., of counsel), for plaintiffs.

Lee Loevinger, Asst. Atty. Gen., John H. D. Wigger, Attorney, Department of Justice, Washington, D. C., John T. Curtin, U. S. Atty. Western District of New York, Buffalo, N. Y., for the United States of America.

Robert W. Ginnane, General Counsel, Leonard S. Goodman, Washington, D. C., Attorney, for the Interstate Commerce Commission.

Before FRIENDLY, Circuit Judge, BURKE, Chief Judge of Western District of New York, and HENDERSON, District Judge.

FRIENDLY, Circuit Judge.

Davis & Randall, Inc. (hereafter D & R), a New York corporation with its principal place of business in the Western District, is engaged in the interstate transportation of a few types of commodities in truckload lots. It filed with the Interstate Commerce Commission schedules, to become effective on January 21, 1960, for reduced truckload rates on malt beverages, minimum 38,000 pounds, from Newark, N. J. to certain Ohio, Indiana and Illinois points. Typical proposed rates, all stated per hundred pounds, were 70¢ for a 589-mile haul to Dayton as against the existing rate of 100¢, 81¢ for a 699-mile haul to Indianapolis as against 107¢, and 90¢ for a 895-mile haul to Peoria as against 121¢. Upon protest by certain railroads operating in trunk-line territory, the Commission, by order issued January 18, 1960, suspended the proposed rates until August 20, 1960, and by further order dated June 1, 1960, directed that an investigation of the rates be conducted under the modified procedure prescribed in §§ 1.45–1.54 of its General Rules of Practice, 49 C.F.R. §§ 1.45–1.54 (Supp.1962). The gist of this procedure, embodied in 49 C.F.R. §§ 1.51 and 1.53 (Supp.1962), is that "complainant shall serve upon the other parties a statement of all the evidence upon which it relies"; that "Within 30 days thereafter defendant shall serve its statement"; that "Within 10 days thereafter complainant shall serve its statement in reply"; and that "If cross examination of any witness is desired the name of the witness and the subject-matter of the desired cross examination shall, together with any other request for oral hearing, including the basis therefor, be stated at the end of defendant's statement or complain-

ant's statement in reply as the case may be."

In July, 1960, D & R filed its opening statement, to which were attached three verified statements with accompanying exhibits. One, by Smith, D & R's office manager, described the general nature of its business and sought to justify the proposed rates on various grounds. The second, by Pollen, the traffic manager of the P. Ballantine & Sons brewery in Newark, explained its need for rates such as D & R's based on a 38,000-pound minimum, as against the rail rates for 60,000-pound or 50,000-pound minimum—quantities said to be too large for effective competition by Ballantine with breweries more favorably located in the mid-western territory where it wished to sell. The third, by Howells, a former employee of the Commission's Cost Section and now a private practitioner in cost and traffic analysis, undertook to demonstrate the compensatory character of the rates.

After receiving this material, the railroads, on September 13, 1960, withdrew their protests.[1] A week later, Downing, an accountant in the Commission's Bureau of Accounts, Cost Finding and Valuation ("Cost Section"), telephoned Howells and requested permission to examine the work sheets and other data underlying his cost exhibits. Counsel for D & R promptly wrote the Commission, saying that he assumed the results of Downing's work "would be communicated to the Commission and used by it in preparing its findings of fact and conclusions as to the lawfulness of the proposed rates"; that in his view "any evidentiary matters which go into the making of the decision in this case are prop-erly made only upon the record where opportunity is afforded parties to cross-examine the witness and offer rebuttal evidence;" and that under the circumstances he had no objection to granting Downing's request provided that D & R "is furnished with all of the information conveyed by the Cost Section to the Commission and that opportunity is afforded [D & R] to cross-examine the witness and offer rebuttal evidence"—in the absence of which, he must decline the request. The Commission made no response.

On November 21, 1960, Division 2 of the Commission issued its report and order, 311 I.C.C. 633. This stated that "a minimum requirement" to meet the carrier's burden, under § 216(g) of the Interstate Commerce Act, 49 U.S.C. § 316(g), of showing the proposed rates to be just and reasonable, "is an affirmative showing that the rates are reasonably compensatory," but that "the record fails to afford adequate support for the cost data presented," and the burden had therefore not been sustained; hence an order directing cancellation of the rates would be entered.[2] D & R's petition for rehearing or reconsideration having been denied, D & R and National Motor Freight Traffic Association, Inc. filed in this court their complaint against the United States and the Commission to set aside and annul the Commission's order, 28 U.S.C. §§ 1336, 1398, 2284, and obtained a temporary restraining order. Subsequently this court of three judges was convoked, as provided in 28 U.S.C. §§ 2284, 2321–25, and a hearing was held on plaintiffs' application for final relief.[3] We have concluded that an injunction should issue.

---

1. Meanwhile, at the expiration of the suspension period on August 20, D & R had voluntarily postponed indefinitely the effective date of the new rates.

2. The report began by reciting, in the language of § 8(a) of the Administrative Procedure Act, that "due and timely execution of our functions under section 216(g) of the Interstate Commerce Act imperatively requires the omission of a recommended report and order in this proceeding." We do not altogether understand why this was so, since D & R had indefinitely postponed the effective date of the proposed rates. However, plaintiffs have made no point of this, and neither shall we.

3. At the hearing we asked whether the defendants challenged the standing of plaintiff National Motor Freight Traffic Association, Inc.; counsel responded that defendants took no position on the issue,

D & R's first argument is that the Commission could not lawfully proscribe the rates solely on the ground that they were non-compensatory, without taking into account other evidence of reasonableness, such as the shipper's need for the rates to enable it to compete more effectively in the Ohio, Indiana and Illinois markets, the lack of adverse effect upon competing carriers since the traffic was not moving by rail under existing rates anyway, and the higher revenue per vehicle-mile produced by the proposed rates than by existing rates for shorter hauls. Consideration of such factors would have been altogether appropriate—particularly so in this case, since the absence of protest by, and of evidence of adverse effect on, competitors, left protection of the carrier against its own unwisdom and the possible consequent burdening of its other traffic as the only bases for government intervention. But although the Commission under some circumstances may permit a carrier to establish a rate not proved to cover out-of-pocket costs, it is not required to do so. Chicago & E. I. R. R. v. United States, 107 F.Supp. 118, 125 (S.D.Ind.1952), aff'd, 344 U.S. 917, 73 S.Ct. 346, 97 L.Ed. 707 (1953); Boston & Maine R. R. v. United States, 153 F.Supp. 952, 957 (D.Mass.1957); Malone Freight Lines, Inc. v. United States, 159 F.Supp. 952 (N.D.Ala.1957); Malone Freight Lines, Inc. v. United States, 204 F.Supp. 745, 755 (N.D.Ala.1962); Atlantic Coast Line R. R. v. United States, 209 F.Supp. 157 (S.D.Fla.1962).

D & R then attacks the Commission's conclusion that it had not sustained its burden of proving the rates compensatory. This attack proceeds on two grounds which, as will be seen, tend to fuse—that the conclusion is not supported by substantial evidence on the record considered as a whole, and that D & R was denied the fair hearing guaranteed by § 216(g) of the Interstate Commerce Act and §§ 5 and 7 of the Administrative Procedure Act.

Howells found "the proposed rates to be higher than out-of-pocket costs in every instance," the ratio of out-of-pocket cost to proposed revenue ranging from "a low of 62 percent at 405 miles to 95 percent at 922 miles." The Commission does not question that such ratios would be satisfactory; it claims rather that they were not established by the evidence. Howells arrived at them by using data from Smith's statement and the carrier's 1959 annual report to the Commission and purportedly applying, with one important adjustment described below, a cost formula prepared by the Commission's Cost Finding Section and published as Statement No. 3–59, "Simplified Procedure for Determining Cost of Handling Freight by Motor Carriers," commonly called and hereafter referred to as "Highway Form B".[4] Before examining the Commission's criticisms of Howells' evidence, it will be useful to state our views as to the hearing requirements and the scope of review in the circumstances.

The Commission's modified procedure is a commendable effort to limit hearings to those cases and even to those witnesses where an oral hearing is essential to fairness. As will have been noted, the rules governing this proce-

since D & R plainly had standing and question as to the Association's standing was thus academic. We shall follow the same course.

4. The form, which was revised in July, 1962, and republished as Statement No. 5–62, states, on its cover page, that the formula embodied therein "was designed as a simplified method of developing motor carrier costs on a basis which relied, in the main, on currently reported accounts and statistics and did not en-

tail extensive special studies," that its procedures "have been widely used and with some modifications have been introduced in behalf of carriers in proceedings before this Commission," that it was being released "as a matter of information for carriers, shippers, regulatory agencies, and others who need a simplified approach to motor carrier costs," but that it "has not been considered or adopted by the Interstate Commerce Commission."

dure read in terms of an adversary proceeding. What created a problem here is that what had been an adversary proceeding when the modified procedure was ordered, ceased to be one after the railroads withdrew their protest. The Commission did not thereupon direct its Bureau of Inquiry and Compliance or its Cost Section to participate, as it sometimes does [5] and as other independent regulatory agencies customarily do.[6] Hence there was no "defendant" or other party to serve a statement of its evidence or to seek cross-examination of D & R's witnesses, and no witness of another party for D & R to seek to cross-examine. D & R asserts that since its cost evidence stood uncontradicted and uncriticized when the case was submitted, the Commission was bound to accept it. The Commission, taking an equally extreme position, says that even in a proceeding where there is no adversary, it is always free to disregard expert testimony offered by the proponent without communicating its criticisms before decision, so long as it does not rely on "facts" outside the record. We do not agree with either view.

 The Supreme Court has ruled that a commission is not bound to accept expert opinion evidence tendered by a proponent when the experts are in disagreement and interested, the subject is inherently uncertain, and the opinion is founded on a basic theory which the commission could lawfully disapprove. Dayton Power & Light Co. v. Public Utilities Comm'n, 292 U.S. 290, 298–300, 54 S.Ct. 647, 78 L.Ed. 1267 (1934); see Uncasville Mfg. Co. v. C. I. R., 55 F.2d 893,

897 (2 Cir.), cert. denied, 286 U.S. 545, 52 S.Ct. 497, 76 L.Ed. 1282 (1932). How far the decision turned on the cumulative effect of these negative factors is impossible to determine. Compare Bryant v. C. I. R., 76 F.2d 103, 105 (2 Cir., 1935); Bonwit Teller & Co. v. C. I. R., 53 F.2d 381, 383 (2 Cir., 1931), cert. denied, Bonwit Teller & Co. v. Burnet, 284 U.S. 690, 52 S.Ct. 266, 76 L.Ed. 582 (1932); see R. H. Oswald Co. v. C. I. R., 185 F.2d 6, 8–9 (7 Cir., 1950), cert. denied, 340 U.S. 953, 71 S.Ct. 573, 95 L. Ed. 687 (1951), and compare Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 626–29, 64 S.Ct. 724, 88 L.Ed. 967 (1944). Even though Howells was a qualified expert and as disinterested as an expert called by a party ever is, the Commission as the "tribunal appointed by law and informed by experience", Illinois Central R. R., etc. v. I. C. C., 206 U.S. 441, 454, 27 S.Ct. 700, 51 L.Ed. 1128 (1907), would scarcely be bound, even in the absence of cross-examination or rebutting testimony, to accept cost evidence fallacious on its face—as, for example, a railroad's claim that certain less-than-carload freight traffic could be handled "without a cent of additional cost" save for trucking, loading and unloading, and billing.[7] But none of these principles decides this case, where the subject-matter is fairly susceptible of measurement and the expert was concededly competent and purported to base his analysis on a method published even though not formally "considered or adopted" by the Commission itself. Somehow it does not seem consistent with the policy underlying the APA that

5. See, e. g., Iron or Steel Scrap—Conn., Mass. & R. I. to Pa., 15 Fed.Carriers Cases ¶ 35,525 (Dec. 3, 1962); Minimum Charges in Central Territory, 47 M.C.C. 259, 262 (1947); Increased Freight Rates, 1958, 304 I.C.C. 289, 293 (1958).

6. See, e. g., F.C.C. Rules of Practice, 47 C.F.R. § 1.21(b) (1958); F.P.C. Rules of Practice and Procedure, 18 C.F.R. § 1.20(e) (1961); C.A.B. Rules of Practice, 14 C.F.R. § 302.9 (1952).

7. Pick-Up and Delivery in Official Territory, 218 I.C.C. 441, 495 (1936) (dis-

senting opinion of Commissioner Eastman). The same may well be true when the Commission rejects cost figures submitted by a proponent in favor of figures computed by its staff from a formula published by it, at least when no question is raised as to the accuracy of the computation. Apparently this was done in Iron Ore from Eastern Ports to C.F.A. Points, 314 I.C.C. 149, 162 (1961), approved as to this ground in New York Central R. R. v. United States, 207 F.Supp. 483, 493–494 (S.D.N.Y.1962), although no procedural objection was there taken.

an agency should be able to reject such testimony on the basis of arguments which the expert never heard and which he might well have been able to answer.

██ The problem has its difficulties. In these days of mounting dockets, courts should not force administrative agencies to hold hearings that are sure to be unproductive. It can well be argued that if the railroads had continued their protest, the Commission would not have been bound to accept the cost evidence of either side but could have come to its own conclusions, even though it had called no witnesses; why should it be any less able to do this because the railroads withdrew? But this ignores that in the supposititious case each side would have presented its evidence and made its arguments knowing of the case against it, and that if D & R had succeeded in destroying the railroads' arguments, it might, in the course of this effort, have presented considerations that would have persuaded the Commission or, if not, a reviewing court. Without wishing to be held to the letter, we suggest that a rejection of unopposed testimony by a qualified and disinterested expert on a matter susceptible of reasonably precise measurement, without the agency's developing its objections at a hearing, ought be upheld only when the agency's uncommunicated criticisms appear to the reviewing court to be both so compelling and so deeply held that the court can be fairly sure the agency would not have been affected by anything the witness could have said had he known of them, *and* the court would have been bound to affirm, despite the expert's hypothetical rebuttal, out of deference for the agency's judgment on so technical a matter. See New York v. United States, 331 U.S. 284, 328, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947); New York Central R. R. v. United States, 207 F.Supp. 483, 493–494 (S.D.N.Y.1962). If we should find that this case does not meet that criterion, it is not too important whether the conclusion that the Commission's order must be enjoined is predicated on § 10(e) (4) of the APA on the basis of a violation of the hearing requirements of §§ 5(b) and 7(c), or on a finding under § 10(e) (5) that the order is "unsupported by substantial evidence," or on both. Neither would we regard it as a sufficient answer that D & R was able to present counter-arguments by a petition for rehearing or reconsideration. Argumentative criticisms of expert testimony cannot be refuted by such a petition nearly so well as by the expert himself, who can often bring new facts to his support; and for commissioners, as for judges, freedom of decision is at least subconsciously constricted once a position has been publicly taken.[8] It is with this view of the law that we approach the commission's criticism of D & R's cost evidence.[9]

8. An additional factor in the instant case is that the petition for rehearing or reconsideration seems to have been acted on by the full Commission—the filing of the petition having antedated the amendment of 49 C.F.R. § 1.101(a) (Supp.1962), 26 F.R. 224 (Jan. 12, 1961), which restricted the right to apply to the full Commission for reconsideration or rehearing. In view of the number of such petitions—the very reason for the amendment of the Commission's rules—it is quite unrealistic to suppose that D & R's petition received the kind of study that would have resulted from development of the issues at a hearing; we say this in no spirit of criticism but in recognition of the burdens resulting from the volume of the Commission's workload.

9. One criticism which we shall not examine, because we do not understand its relevancy, is that "The procedure advocated by the respondent is to consider system empty vehicle-miles as an overhead expense to the system loaded movements, thus producing a lower line-haul cost for this traffic. Our treatment of the empty vehicle-miles on a mileage-block basis recognizes that traffic of different lengths of haul incur proportional amounts of empty vehicle-miles." We do not see where Highway Form B, which is based on the costs of the particular carrier whose rates are under study, ever utilizes such mileage blocks; cost scales prepared on that basis, as we understand, are published by the Commission as territorial averages for use where no such

(1) The Commission's most basic objection to Howells' study was that "Highway Form B is designed primarily for determining costs of general freight carriers which are required to furnish a breakdown of their accounts and statistics as required by the Commission's accounting regulations. Application of this cost formula to the respondent, a special commodity carrier, would necessitate considerable readjustment. The record does not contain sufficient information to make this readjustment." 311 I.C.C. at 635–36. But there is nothing in the description on the cover of Highway Form B, which we have quoted in note 4, supra, to suggest this limitation. With one exception which does not seem obviously sufficient,[10] the Commission's brief does not explain in any way we can understand why a formula that accomplishes the much more complicated task of distributing costs among a great variety of commodities and weights cannot be made to serve for the simpler mission here.

The Commission argues that although Highway Form B does not say it is inapplicable to a carrier like D & R, decisions of the Commission have made this plain. We do not find the decisions so rigid. In Frozen Fruit Products from Florida, 302 I.C.C. 489, 494 (1957), aff'd, 304 I.C.C. 249 (1958), cost data obtained by use of Highway Form B were rejected with a statement that the formula "is designed to apply only to motor common carriers of general freight," but

Division 3 went on to develop specific objections, including the compelling one that the respondent, which used purchased transportation almost exclusively, had arbitrarily shown as line-haul expenses the percentage of revenues paid to owner-operators, "thereby practically nullifying the value of the formula." In Sugar from Idaho and Utah to Oklahoma and Texas, 306 I.C.C. 271 (1959), Division 3, while again making the general statement here relied on, also made specific and apparently valid criticisms of the application of the form to the traffic in question. In both these cases, it should be added, there was a hearing where all this could be developed of record. On the other hand, in Peddler Service-Indianhead Truck Service, Inc., 308 I.C.C. 723, 727 (1959), Division 2 recognized that although another of the Commission's cost formulae, Highway Form F "require[s] some special studies of the carrier's operations" which had not been made, "the form can be used to distribute the respondent's mileage, hourly, and trip expenses."[11] And plaintiffs call our attention to a recent case, Iron or Steel Scrap—Conn., Mass. & R.I. to Pa., 15 Fed.Carriers Cases ¶ 35,-525 (Dec. 3, 1962), in which the Commission's Bureau of Inquiry and Compliance, arguing against rates proposed by a specialized truckload operator, based on Highway Form B with "a couple of minor changes", offered testimony, and the full Commission found that "the Bureau's cost study is a substantially ac-

detailed study of a particular carrier's operation is being made. Apart from this, the statement would not seem pertinent unless the relatively long hauls here proposed attract a larger proportion of empty vehicle miles, which the Commission does not say.

10. This point is that, although D & R did not report any pick-up-and-delivery expenses in its 1959 report, and stated that it performed "No Pickup & Delivery Service," and although Smith's statement said that the beer traffic "is normally loaded by the shipper" and that "unloading of beer is performed by the consignee" with mechanized equipment, Howells nevertheless developed a terminal unit cost of

1.671 cents per c.w.t. for use with Highway Form B, which segregates such costs from line-haul expenses. Although this may have been wrong, the Commission does not tell us why. The costs found by Howells do seem low, but D & R's petition for reconsideration alleged that application of his unit costs to its total 1959 traffic reconciled within 3% of its reported expenses.

11. Return-Load Rule, Emery Transportation Co., 310 I.C.C. 473, 478 (1960), also cited by the Commission, disapproved the carrier's use of Highway Form B because its operation called for use of Highway Form F.

curate reflection of the best available information" and, because it showed a great disparity between the respondent's costs and the assailed rates, that it sufficed to make "a *prima facie* case." The Commission there also said that with the information such carriers are required to furnish in their annual reports, "Highway Form B can be applied to develop the cost of a particular movement." We see no reason why the same considerations should not apply here, unless specific criticisms of Howells' study discredit it so substantially as to warrant its rejection without a hearing.

(2) The most important such criticism relates to the treatment of return mileage.

Recognizing the impropriety of considering only the results of an outbound movement, see Wire, Rope, or Strand from St. Joseph, Mo., 309 I.C.C. 272 (1959), Highway Form B provides that, in computing costs for truckload shipments, the outbound load should be added "to the load when known in the reverse direction" or, when this is not known, to "the system average load," and the result divided by two. Here the outbound load was the minimum of 38,-000 pounds, the load in the reverse direction was not known, and the system average in 1959 had been 26,680 pounds. Howells pointed out that the formula method gives insufficient effect to the benefit of a higher than usual minimum outbound. Thus, for a carrier with an average load of 26,000 pounds, the formula would result in costing a minimum outbound load of 30,000 pounds by dividing per mile costs by 28,000 pounds, and in costing a minimum outbound load of 38,000 pounds by dividing per mile costs by 32,000 pounds, or only 4000 pounds more—a result indefensible if the movement with the 8000 pound higher minimum was as likely to produce a substantial return load as that with the lower. Considering that all of D & R's traffic moved in truckloads, that 1959 empty mileage was believed to have been only 10.69% of the loaded miles, and that Smith predicted that the new movement

would not increase this ratio, Howells considered the result of applying the formula, as written, which would charge the instant movement with 17.50% for empty return miles, so unreasonable as to require an adjustment. The problem, as he saw it, was to make all of D & R's loads bear their proper proportion of the cost of empty mileage; he sought to accomplish this by increasing the line-haul costs as developed in Highway Form B by the 1959 ratio of empty to loaded miles, to wit, 10.69%—the method used by the Commission's cost formula for rail carload traffic, and conservative in the sense that, as the Commission itself points out in its brief, an empty mile does not in fact cost as much as a loaded mile.

No basis for thinking the Commission's method was more accurate than Howells' as applied to D & R's operation has been presented to us by the Commission, and, despite our own endeavors to that end, we have been unable to think of any. Perhaps, as the Commission suggests in its brief, neither method is just right as applied to D & R. We can see that there might be substance to a claim that outbound movements are more likely than inbound movements to result in empty return mileage, and therefore use of the system average empty mileage ratio in the return movement would unduly advantage the outbound and burden the return movement, although we should suppose somewhat the same considerations would apply in carload rail traffic. But whether this premise applies to D & R's traffic in general and to the proposed movement of Ballantine beer in particular and, if so, how much Howells' figures should be increased on that account, are the kinds of inquiries that ought to have been made at an evidentiary hearing. Moreover, at our request subsequent to the argument, the Commission, without prejudice to any of its contentions, has computed for us D & R's costs according to Highway Form B as written; this computation shows that with an upward adjustment of mileages by 6% to reflect circuity over the short-

line mileage, which the Commission considers necessary and D & R does not seriously dispute,[12] the rates are compensatory for all hauls up to 820 miles—which includes all the Ohio and Indiana points and Chicago. Hence, even on the basis of Highway Form B as written, the Commission would not have been warranted in rejecting most of the proposed rates, if Howells' division between line-haul and terminal costs was correct,—unless there is merit in its final criticism, to which we now turn.

(3) The Commission contends that the basic data utilized in Howells' study may be inaccurate. The grounds for this are as follows:

Most of Howells' basic figures came from a study by Smith of all of D & R's 1959 traffic. Smith's analysis had revealed that ton miles, number of shipments, and average load were all smaller than reported in D & R's Annual Report for 1959, the difference being explained as having been due to the calculation of the annual report figures "on an estimated basis by taking one week's business and multiplying by 52 to arrive at a total, whereas the study figures were derived from an analysis of each trip." In one instance, however, Howells made use of a figure from the Annual Report; to determine the empty vehicle-miles he deducted the loaded vehicle-miles shown in Smith's traffic study from the total vehicle-miles in the report.

The Commission says that since estimating annual totals on the basis of one week's operations is manifestly erroneous, and was here proved to be,[13] all of Howells' conclusions are discredited. But, apart from the point that the corrections in all the other figures were downward so that in all likelihood the error operated to increase empty mileage and, consequently, cost

per loaded mile, this would seem the kind of attack normally required to be made at a hearing where the witness can defend himself or set parameters on any error. What gives us some pause in sustaining D & R on this basis is the letter of its counsel declining to permit examination by Downing of Howells' worksheets, etc., save on the basis outlined; if D & R improperly refused access to data needed by the Commission for a hearing, it can scarcely be heard to complain of the lack of one. Counsel's proposal that if the Commission's examination developed any criticism of Howells' study, D & R should have an opportunity to cross-examine and offer rebuttal evidence, was an appropriate suggestion in the light of the aborting of the modified procedure as a result of the railroads' withdrawal of their protest. But the other condition, that D & R be "furnished with all of the information conveyed by the Cost Section to the Commission" is more troublesome. It was entirely proper for the Commission to have its staff prepare such a report, which might, in some cases, lead to abandonment of the investigation; whatever D & R's rights would be if the Commission used data *dehors* the record to support an order made without a hearing, it was not entitled to inspect this kind of internal communication in advance of a hearing. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); Norris & Hirshberg, Inc. v. S. E. C., 82 U.S.App.D.C. 32, 163 F.2d 689, 693 (D.C.Cir. 1947), cert. denied, 333 U.S. 867, 68 S.Ct. 788, 92 L.Ed. 1145 (1948); T.S.C. Motor Freight Lines, Inc. v. United States, 186 F.Supp. 777, 787–90 (S.D.Texas, 1960), aff'd sub nom. Herrin Transportation Co. v. United States, 366 U.S. 419, 81 S.Ct. 1356, 6 L.Ed.2d 387 (1961). On the other hand, if the employee who made the report were to

12. On Howells' figures, adjustment for the 6% circuity factor would still leave all the rates compensatory save for two Illinois points, and there the excess of cost over revenue would be a fraction of a cent per vehicle mile.

13. D & R contends that Smith's statement must be taken as verifying the correctness of the Annual Report figures save for the three specifically corrected. That would be a possible interpretation but the Commission was not bound to read the statement that way.

testify, D & R would then be entitled to see relevant portions of his report as a possibly inconsistent statement. See Communist Party of United States v. Subversive Activities Control Board, 102 U.S.App.D.C. 395, 254 F.2d 314, 326–330 (D.C.Cir. 1958), applying Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), to an administrative proceeding, followed in N. L. R. B. v. Adhesive Products Corp., 258 F.2d 403, 406 (2 Cir., 1958); Carlisle v. Rogers, 104 U.S.App.D.C. 307, 262 F.2d 19 (D.C. Cir. 1958); Great Lakes Airlines, Inc. v. C. A. B., 291 F.2d 354, 363–365 (9 Cir.), cert. denied, 368 U.S. 890, 82 S. Ct. 143, 7 L.Ed.2d 89 (1961); Schere v. Christenberry, 179 F.Supp. 900, 905–906 (S.D.N.Y.1959); see also Bernstein v. United States, 256 F.2d 697, 702–704 (10 Cir., 1958), petition for cert. dismissed, 358 U.S. 924, 79 S.Ct. 296, 3 L.Ed.2d 298 (1959); Raser Tanning Co. v. N. L. R. B., 276 F.2d 80, 82 (6 Cir.), cert. denied, 363 U.S. 830, 80 S.Ct. 1601, 4 L.Ed.2d 1524 (1960) (citing amended NLRB Reg. § 102.95). Reading counsel's letter as a whole, we think it can be taken as requesting a hearing in the event that Downing's inquiry did not satisfy the Commission of the propriety of the rates, and seeking access to his report for use in that event. Since a telephone call from the Commission to D & R's counsel, whose office was only a few blocks away, might well have succeeded in adjusting this not very momentous problem, and since the Commission has not argued here that counsel's demands were improper and warranted denial of a hearing, we are not disposed to hold the letter too strictly against him.

 Although the minimum rate power concededly may be exercised in the absence of objection to the rates by other carriers, in a close case of this nature some weight ought be given to management decision; there was nothing here to suggest that D & R's management was incompetent or that it had any reason or desire to impair the return on capital and operating ratio it had shown for 1959 by hauling Ballantine beer at a loss, thereby burdening itself and its other traffic. In the light of this, of the apparently reasonable nature of Howells' cost evidence, of our inability to find the Commission's criticisms so strong that they would necessarily have survived a hearing and would call for affirmance no matter what a hearing produced, and of the negligible possibility of injury to the public from allowing the rates to take effect, we will enjoin enforcement of the Commission's order. This is without prejudice to any future action the Commission may be advised to take with respect to the rates in a complaint proceeding under § 216(e) of the Interstate Commerce Act. We are informed that the rates, which have become effective under the restraining order, are now producing revenues of about $88,000 a year; this actual movement should give a better basis for cost determination than the best of forecasts.

If the parties are unable to agree on the terms of the injunction, it will be settled by Judge HENDERSON on five days' notice.

BURKE, Chief Judge (concurring).

I would enjoin enforcement of the Commission's order on the ground that Davis and Randall, Inc., was deprived of an adequate hearing by the failure of the Commission to afford it an opportunity to meet evidence outside the record. Interstate Commerce Commission v. Louisville and Nashville R. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431. Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288. I concur in the conclusion reached by Judges FRIENDLY and HENDERSON.