GREAT LAKES AIRLINES, INC., et al.,
Petitioners,

v.

CIVIL AERONAUTICS BOARD OF the
UNITED STATES, Respondent.

No. 16672.

United States Court of Appeals
Ninth Circuit.

May 4, 1961.

Keatinge & Older by Roland E. Ginsburg, Los Angeles, Cal., for petitioners.

Robert A. Bicks, Asst. Atty. Gen., Richard A. Solomon, Atty., Dept. of Justice, Franklin M. Stone, Gen. Counsel for Civil Aeronautics Bd. (CAB), John H.

Wanner, Deputy Gen. Counsel, for CAB; O. D. Ozment, Associate Gen. Counsel, Litigation and Research, William F. Becker and Morris Chertkov, Attys., for CAB, Washington, D. C., for respondent.

Before HAMLEY, HAMLIN and MERRILL, Circuit Judges.

HAMLEY, Circuit Judge.

This is a petition to review an order of the Civil Aeronautics Board entered at the conclusion of an administrative enforcement proceeding. The petitioners are two air carriers (Great Lakes Airlines, Inc., and Currey Air Transport, Ltd.), Irving E. Hermann and Ida Mae Hermann, his wife, and several service companies and ticket agencies, all respondents in the enforcement proceeding. Several other respondents were dismissed from that proceeding and are not petitioners here.

The administrative proceeding was instituted on October 14, 1954, by the Board's bureau of enforcement, formerly called the office of compliance. In the bureau's complaint filed on that day petitioners were charged with the knowing and willful violation of certain provisions of the Civil Aeronautics Act, administrative regulations and a Board order.[1]

The acts allegedly constituting these violations were of the following five kinds: (1) The two air carriers, each holding authority to conduct only infrequent and irregular operations between any two points, actually held out and provided a regular and frequent transcontinental service; (2) the two carriers together with respondent ticket agencies and service companies, all under the common control and management of the Hermanns, held out and conducted regular operations as a single integrated carrier, which carrier lacked authority to engage in air transportation; (3) petitioners entered into various control relationships without Board approval; (4) petitioners disregarded the prohibition against combining the operations of irregular carriers in order to effect a regular service; and (5) petitioners did not comply with certain ticket agency requirements which were designed to forestall various abuses.

The relief sought by the bureau of enforcement was an order revoking the licenses of Great Lakes and Currey to engage in air transportation and requiring all petitioners to cease and desist from engaging in air transportation, directly or indirectly, and from violating section 408 of the Civil Aeronautics Act.

Hearings were held before a hearing examiner of the Board from January through April 1955. The hearings were then in recess until August 1957, pending proceedings brought by the Board against petitioners to enforce administrative subpoenas. The outcome was a court order enforcing the subpoenas. See Hermann v. CAB, 9 Cir., 237 F.2d 359, reversed sub nom. CAB v. Hermann, 353 U.S. 322, 77 S.Ct. 804, 1 L.Ed. 2d 852.[2]

---

1. The Civil Aeronautics Act of 1938, 52 Stat. 977, 49 U.S.C.A. §§ 401–705, was superseded on December 31, 1958, by the Federal Aviation Act of 1958, 72 Stat. 737, 49 U.S.C.A. §§ 1301–1542. The 1958 act made no change in the provisions here relevant. References herein will be to the Federal Aviation Act. The particular statutory provisions petitioners were alleged to have violated are sections 401(a), 408 and 1005(e) of the act, 49 U.S.C.A. §§ 1371(a), 1378 and 1485(e). The regulations alleged to have been violated are sections 291.23, 291.24 (14 C.F.R. 1956) and former section 242.5(b)(4) (14 Fed.Reg. 35 (1949)) of the Board's economic regulations. The

Board order petitioners were alleged to have violated is Order No. E–6748, Docket 4161, August 28, 1952.

2. In addition to CAB v. Hermann, noted above, the Board initiated another court proceeding in the United States District Court for the Southern District of California to enforce a subpoena served upon Gladys Shepherd. Such an order was obtained.

Petitioners have initiated several court actions involving aspects of this administrative proceeding, as listed in an appendix to the examiner's initial decision. Among these was a suit brought on January 17, 1955, in the United States

The hearings were resumed in August 1957 and continued through December of that year. The examiner issued his initial decision on January 19, 1959. He found that petitioners had knowingly and willfully violated the statutory provisions, and the regulations and previous order of the Board by their acts as described above. It was his conclusion that all the relief sought by the bureau of enforcement should be granted.

Petitioners filed exceptions to the initial decision, and argument was had before the Board on May 6, 1959. The Board issued its order on September 28, 1959. The findings and conclusions of the examiner were for the most part adopted. Consistent therewith, the Board's order revoked the licenses of Great Lakes and Currey to engage in air transportation. In the same order all petitioners were required to cease and desist from engaging in air transportation, directly or indirectly, and from violating section 408 of the act.

Petitions for rehearing, reargument and reconsideration, and for a stay of the order of September 28, 1959, pending judicial review were denied on November 10, 1959. The instant petition for review was filed in this court on November 14, 1959.[3] We have jurisdiction under 49 U.S.C.A. § 646(a), and venue is proper under 49 U.S.C.A. § 646(b). We stayed the Board order of September 28, 1959, pending disposition of this petition for review.

In seeking to set aside the Board order, petitioners first advance several arguments with regard to the appearance of Board employees as witnesses.

On November 12, 1957, counsel for petitioners presented to the examiner subpoenas *ad testificandum* calling for the appearance as witnesses of eight Board employees.[4] The examiner immediately declined to issue the subpoenas. He did so on the ground that the provisions of rule 19(g) of the Board's procedural regulations were controlling and the procedure set forth in that rule must be followed.[5]

While petitioners were thus required to follow the rule 19(g) procedure, the bureau did not follow that procedure with respect to the ten Board employees whom it called as witnesses. Petitioners argue that it was therefore improper for the examiner to receive the testimony of Board employees called by

District Court for the District of Columbia for an injunction against further administrative proceedings in this case. Great Lakes v. Chan Gurney, Civil No. 2095-55, D.D.C., January 17, 1955. The district court denied the petition for injunction and granted the Board's motion to dismiss. The Court of Appeals for the District of Columbia denied a motion for an injunction pending an appeal from the district court order. No. 12,-567, C.A.D.C., February 21, 1955.

3. After the petition for review was filed in this court petitioners on November 21, 1959, filed a motion with the Board to take depositions or to reopen the hearing to receive additional evidence. The Board denied this motion on December 8, 1959, and on February 5, 1960, denied a petition for reconsideration of the latter order.

4. Alphonse M. Andrews, James Saltzman, William Sullivan, John B. Flynn, Joseph Stout, Eleanor S. Walker, Robert Burstein and James Anton.

5. At the time of the hearing rule 19(g) read as follows:

"The provisions of this section [which applies to subpoenas] are not applicable to the attendance of Board members, officers or employees or the production of documentary evidence in the custody thereof at a hearing. Applications therefor shall be addressed to the Examiner in writing and shall set forth the need of the moving party for such evidence and its relevancy to the issues of the proceeding. Such applications shall be processed as motions in accordance with § 302.18 (Rule 18), except that the grant thereof by an Examiner, in whole or in part, shall be immediately reviewed by the Board upon its own initiative and shall be subject to final Board action." 18 Fed.Reg. 7627 (1953) (amended by CAB Procedural Reg. No. 30, 22 Fed. Reg. 10438 (1957), as amended, 14 C.F.R. § 302.19(g) (1960 Supp.)).

the bureau and the documents introduced in connection with their testimony.

In support of this argument petitioners point out that in the Board's discussion of rule 19(g) at the time of its adoption the statement was made that "[T]he Board does not intend to deprive *parties* of the opportunity to request, in appropriate situations, the testimony of Board personnel * * *." (Emphasis supplied.) [6] Rule 9 of the Board's Rules of Practice provides that "The term party wherever used in this part shall include * * * the Compliance Attorney in any proceeding." 14 C.F.R. § 302.9 (1956). Petitioners also call attention to the fact that rule 19(g) was subsequently amended to provide that "No application will be required for the attendance of Board personnel or the production of records in their custody when requested by a Compliance Attorney." [7] It is argued from this that prior to the amendment of rule 19(g) the Board's enforcement attorney was subject to that rule.

Rule 19 is entitled "Subpenas." It deals with compulsory attendance and compulsory production of documents. As originally worded, rule 19 contained no specific provision excluding from the application of the rule the testimony of Board personnel or the production of Board documents in economic proceedings. The Board, however, had consistly construed rule 19 in its original form as not applicable to the attendance of Board officers or employees as witnesses or the production of Board records. For the purpose of clarifying the rule in this respect and to provide a procedure whereby the testimony of Board personnel and the production of Board records could be obtained in appropriate situations, subsection (g) was added to rule 19 in 1953.[8]

Rule 19(g) thus specified the procedure to be followed where the compulsory attendance of Board personnel or the compulsory production of Board records was desired. It is improbable that rule 19(g) was intended to afford a procedure available to the enforcement attorney since it would be reasonable to assume that he could always obtain the voluntary attendance of Board personnel. The ten Board employees called as witnesses by the bureau of enforcement attended the hearings and produced records voluntarily. Hence it was not necessary for the bureau to invoke any procedures to compel them to do so, even if the rule 19(g) procedure was then available to the enforcement attorney. Petitioners suffered no prejudice by reason of the fact that Board personnel appeared voluntarily rather than pursuant to rule 19(g) procedure.

The failure of the enforcement attorney to invoke rule 19(g) procedure in obtaining the testimony and documentary evidence submitted by Board personnel did not render that evidence inadmissible.

■ Petitioners further argue, however, that rule 19(g) is violative of section 6(c) of the Administrative Procedure Act, 5 U.S.C.A. § 1005(c), relating to the issuance of subpoenas. It was therefore error, petitioners contend, for the examiner to require them to follow the rule 19(g) procedure in an effort to obtain the attendance of Board employees.

It is provided in section 6(c) of the Administrative Procedure Act that "agency subpoenas authorized by law shall be issued to any party upon request, and, as may be required by rule of procedure, upon a statement or showing of general relevance and reasonable scope of the evidence sought." Rule 19(g) requires the applicant to "set forth the need of the moving party for

6. CAB Procedural Reg. No. 22, adopted November 25, 1953, 18 Fed.Reg. 7625 (Dec. 1, 1953); 14 C.F.R. § 302.19(g) (1956).

7. CAB Procedural Reg. No. 30, adopted December 16, 1957, effective January 1, 1958, 14 C.F.R. § 302.19(g) (1960 Supp.)

8. This purpose is fully explained in the Board regulations cited at note 6.

such evidence and its relevancy to the issues of the proceeding."

Thus the rule requires a showing of relevance as the statute provides may be required by rule of procedure. But while section 6(c) provides that procedural rules may also require a showing of "reasonable scope," rule 19(g) requires that the "need" for the evidence be shown.[9]

The showing which must be made in order to obtain favorable action by the examiner under rule 19(g) is essentially that which is contemplated within the terms of section 6(c). If proposed evidence is relevant and within a reasonable scope, it is unlikely that it would be rejected as unneeded when the rule 19(g) test is applied. Conversely, if proposed evidence is either irrelevant or goes beyond a reasonable scope within the meaning of section 6(c), it would be irrelevant or unneeded within the context of rule 19(g).[10]

From what is said above we conclude that rule 19(g) is not violative of section 6(c) in any respect that could be prejudicial here. But if the requirements under rule 19(g) do go beyond those permissible under section 6(c), the fact remains that no such improper require- ment was imposed in these proceedings. Petitioners' application was denied under der rule 19(g) on the grounds of irrelevance and unreasonable scope, the grounds which section 6(c) specifies may call for denial of an application.

After the examiner declined petitioners' request for the issuance of subpoenas to the eight board employees, petitioners applied on November 12, 1957, under rule 19(g), for the attendance at the hearing of these same employees. This application was denied by the examiner on November 20, 1957. Petitioners contend that the examiner erred in this regard, in that competent and material evidence was thereby excluded. Consideration of this argument makes it necessary to consider the testimony petitioners proposed to elicit from the individual Board employees they sought to call.

Petitioners proposed to examine Board officials Burstein and Anton regarding the Board's alleged lack of compliance with section 9(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1008(b) and former rule 204 of the Board's Rules of Practice.[11] In so far as this proposed testimony is concerned, the rule 19(g) application was denied on the

---

9. Rule 19(g) also provides that if the examiner grants a rule 19(g) application the same "shall be immediately reviewed by the Board upon its own initiative and shall be subject to final Board action." In adopting the rule the Board announced that in making such a review it would follow the general policy of making such evidence available "(a) if found relevant and of reasonable scope, (b) if there is an adequate showing by the moving party of a need for the evidence requested, and (c) if no other substantial considerations, such as security or the Board's investigative or decisional processes are involved." 18 Fed.Reg. 7627 (1953). But since in this case the examiner denied the rule 19(g) application in toto, no Board review being required, we are not here concerned with whether the Board policy as stated above adds tests violative of section 6(c).

10. In expressing this view we are mindful of the fact that the Board's statement of policy, quoted in footnote 9, refers to reasonable scope and need as if they involved different considerations.

11. Section 9(b) reads in relevant part:
 "Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, no withdrawal, suspension, revocation, or annulment of any license shall be lawful unless, prior to the institution of agency proceedings therefor, facts or conduct which may warrant such action shall have been called to the attention of the licensee by the agency in writing and the licensee shall have been accorded opportunity to demonstrate or achieve compliance with all lawful requirements."
 Rule 204 then read:
 "*Satisfaction of formal complaint.* Prior to the institution of an enforcement proceeding pursuant to § 302.205, the person complained against in a complaint submitted pursuant to § 302.201 shall be afforded an opportunity for the submission of facts, offer of settlement or proposal of adjustment, unless time, the nature of the grounds of the complaint, or the public interest will not permit. This opportunity shall be extended in writing and shall be accompanied by

ground that the evidence would not have been relevant.

We assume for present purposes, and the Board does not contend otherwise, that if Burstein and Anton had been permitted to testify it would have been established that petitioners were not given prior notice and opportunity to achieve compliance before this administrative proceeding was instituted, as purportedly then required by section 9(b) and rule 204. The underlying issue thus is not whether there was abuse of discretion in denying this part of the rule 19(g) application, but whether the entire order under review is void for non-compliance with section 9(b) and rule 204.

By its terms rule 204 then applied only with regard to proceedings based on rule 201 (17 Fed.Reg. 3020 (1952), as presently amended, 14 C.F.R. § 302.201 (1960 Supp.)) complaints. Rule 201 complaints are those filed by third parties, as distinguished from complaints verified by the enforcement attorney. This is made clear by rule 205 (now 14 C.F.R. § 302.206 (1960 Supp.)) which specifies that the petition for enforcement shall be accompanied by either a complaint submitted under rule 201 or one verified by the enforcement attorney. The instant proceeding is not based on a third-party complaint, and rule 204 was therefore inapplicable.

Section 9(b) contains several exceptions, one being that the procedures therein prescribed need not be followed in the case of "willfulness" in connection with the conduct which may warrant license revocation or other sanctions. The procedures prescribed in section 9 (b) are to be put into operation prior to the institution of agency proceedings leading to the imposition of sanctions. It follows that the "willfulness" exception applies here only if the bureau at the time it filed the complaint had reasonable grounds to believe that the alleged violations were knowing and willful.

The examiner made and the Board adopted the finding as to willfulness set out in the margin.[12] As to petitioner Great Lakes, the finding that the conduct was knowing and willful is predicated partly upon continued disobedience of Board Order E–6748. That order, Docket No. 4161, was issued on August 28, 1952, prior to the commencement of the instant proceeding. The finding and the evidence supporting it are adequate as to the willfulness of Great Lakes.

As to the other petitioners, there is no express finding that knowing and willful conduct occurred before this proceeding was instituted. But it was found that all of the petitioners acted jointly as a single entity in rendering air transportation service.[13] On the basis of that

a copy of the complaint. Responses to such opportunities shall also be in writing and shall be submitted to the Board within fifteen (15) days after notice of complaint." 17 Fed.Reg. 3029 (1952) (amended by CAB Procedural Reg. No. 30, 22 Fed.Reg. 10438 (1957), as amended, 14 C.F.R. § 302.204 (1960 Supp.)).

12. "The record is clear that the violations of the respondent have been knowing and willful. The maintenance of the prohibited relationships since the commencement of this proceeding and the continuance by Great Lakes of practices prohibited by Order E–6748 on August 28, 1952, demonstrate that the respondents' violations are knowing and willful. The record does indicate some practices have been changed since the institution of this proceeding to bring the respond-

ents' action into closer conformity to the Board's regulations, such as, removing the Skycoach markings from Great Lakes and Currey aircraft, elimination of the word Skycoach in announcing arrivals, and departures, modification of the ticket format, etc. These changes, however, do not indicate any lack of willfulness, but merely an attempt to conceal the prohibited activities and relationships.

"There is no indication whatever of any attempt of Great Lakes and the Hermanns to divest themselves of control of Currey Air Transport or of the Skycoach agencies. It is concluded that the violations of the law were both knowing and willful and continue to be so."

13. The sufficiency of the evidence to support that finding is to be discussed at a later point in this opinion.

362

finding all petitioners are chargeable with the knowing and willful conduct by Great Lakes prior to the commencement of this proceeding.[14]

It is therefore our opinion that the Board was not required to comply with section 9(b) or rule 204 before instituting this proceeding, and the failure to comply therewith did not invalidate the order under review.

■ Petitioners proposed to examine Board officials Andrews and Saltzman in an effort to establish that certain agreements between some of the petitioners had been approved by the Board. It is petitioners' contention that some of the acts which were made the basis of charges in this enforcement proceeding were performed pursuant to those agreements.[15] With regard to these officials the rule 19(g) application was also denied on the ground that their proposed testimony would have been irrelevant.

Section 412(b) of the 1938 act, 52 Stat. 1004 (now 49 U.S.C.A. § 1382(b) (1960 Supp.)), provides that the Board shall approve or disapprove by order certain kinds of agreements between air carriers required to be filed with the Board under section 412(a), now 49 U.S. C.A. § 1382(a) (1960 Supp.). The two agreements here in question were filed with the Board within a year and a half or two years of the commencement of this proceeding. No Board order of approval or disapproval has ever been issued.

Petitioners contend, however, that approval is to be inferred or assumed from the surrounding circumstances. For the purpose of establishing the circumstances relied upon, petitioners sought to show through Andrews and Saltzman the dates when the agreements were filed, whether they were properly filed as section 412 agreements, whether the Board had ever acted on the agreements, and what action the Board had taken thereon.

The dates when these agreements were filed are a matter of official public record, and might also have been established by petitioners' own witnesses. Whether the agreements were properly filed as section 412 agreements is a question of law based on the facts of record concerning the contents of the agreements and the manner of their filing. It was also a matter of public record that the Board had issued no order of disapproval concerning them. Since section 412 contemplated that Board approval would be manifested by order, any testimony concerning internal processing would be irrelevant on the question of approval.

It follows that the proposed testimony of Andrews and Saltzman concerning the matters petitioners proposed to inquire into would have been irrelevant and unnecessary on the question of section 412 approval. Hence the examiner did not abuse his discretion in denying this part of the section 19(g) application.

■ Petitioners' argument on this point also raises the substantive question of whether there was such a lapse of time after the filing of the two agreements here in question that despite the lack of a section 412 Board order, approval should be assumed.

We very much doubt that section 412 approval can ever be inferred from lack of Board action, however long the agreements may have been pending before the agency. Assuming, however, that cir-

14. In the above discussion we have assumed that section 9(b) of the Administrative Procedure Act is applicable with respect to the kind of operating authority under which Great Lakes and Currey function. In Great Lakes Airlines, Inc. v. CAB, D.C.Cir., —— F.2d ——, decided February 24, 1961, one judge dissenting, it was held that Great Lakes, Currey and other carriers involved in that proceeding held at best temporary licenses, and that section 9(b) was not intended to apply to temporary licenses.

15. The agreements provide for each carrier to transport passengers presenting a ticket of one of the other carriers under certain circumstances, to act as ticket agent for the others, and to use the others' facilities "to expedite the handling and checking-in of passengers of each. * * *"

cumstances could exist which would warrant such an inference, we do not believe that they existed here. If these agreements contemplated conduct which was later the object of complaint in this proceeding, it was conduct which was expressly forbidden in the Board's cease and desist order, Order No. E–6748, issued on August 28, 1952. The filing of the enforcement complaint on October 14, 1954, also gave notice that section 412 approval was unlikely after that date.

■ Nor do we find merit in petitioners' argument that the Board had no right to complain in an enforcement proceeding of acts of the kind which were contemplated by the agreements filed pursuant to section 412 requirements until the Board had acted upon them. Petitioners had already been given notice by the cease and desist order of August 28, 1952, that conduct of the kind here complained of would not receive Board approval. Board disapproval of the section 412 filings was therefore not necessary in order to inform petitioners that such conduct was not permissible.

■■ The four remaining Board employees named by petitioners in their rule 19(g) application of November 12, 1957, were Stout, Flynn, Walker and Sullivan. All four had testified in this proceeding in the forepart of 1955. Petitioners sought their return to the witness stand so that three lines of inquiry could be pursued: (1) Their further examination in the light of testimony received from other witnesses after these four had testified; (2) the eliciting of testimony to lay a foundation for impeachment of these witnesses by proof of prior contradictory assertions; and

(3) to elicit information obtained by these four as a result of investigations conducted since the witnesses testified in 1955 pertaining to petitioners' holding out of regular and frequent air transportation.

The request to recall these witnesses was made two and a half years after they had given their original testimony and as the long-drawn-out proceedings were finally drawing to a close. With regard to the proposed examination in the light of intervening testimony and in order to lay a foundation for impeachment, the rule 19(g) application lacked specificity as to what new facts had been revealed and what testimony of these four witnesses would prove self-contradictory or inconsistent. If petitioners had changed their operating procedures since 1955 so as to eliminate the holding out of regular and frequent air transportation, this could be shown by petitioners' own employees. While petitioners may have believed that the testimony of Board employees would carry more weight with the examiner, the examiner was not required to give this factor controlling consideration in passing on the application.

In view of all the circumstances, we hold that petitioners have failed to show that the refusal to recall these four witnesses for the proposed further examination constituted an abuse of discretion.

■ The next question to be considered involves the application of the so-called Jencks rule in administrative proceedings.[16]

Board employees William Auliffe, John Flynn, Eleanor Walker, William P. Sullivan and Franklin Oelschager testified

---

16. As previously noted, the hearings in this proceeding were in recess from April 1955 to August 1957. In the meantime, on June 3, 1957, the Supreme Court announced its decision in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, that defendants in criminal prosecutions have the right to examine statements and reports prepared by government witnesses. The principle there announced, with some modifica-

tions, was later enacted as a statutory rule applicable in criminal prosecutions, on September 2, 1957. 18 U.S.C.A. § 3500.

The validity of this statute as limiting the applicability of the Jencks rule was upheld in Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287; and Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304.

early in 1955. With a partial exception in the case of Flynn, to be discussed below, none of these witnesses was asked on cross-examination whether a written report or statement of the witness relating to the subject matter of the testimony had been prepared. Likewise, and with the same exception, no request was then made by counsel for petitioners that any report or statement of these witnesses be produced for examination.

On September 17, 1957, counsel for petitioners orally moved to recall Auliffe, Flynn, Walker, Sullivan and Oelschager to the witness stand. The asserted purpose of this motion was to enable petitioners to lay a foundation for requesting the production, for inspection and as a basis for cross-examination, of any reports or memoranda then in the possession of the Board which had been prepared by those witnesses bearing upon any testimony they had given.

Petitioners thus sought to apply in this administrative proceeding the underlying principle of the Jencks case and statute. That the principle is generally applicable in administrative proceedings has been judicially recognized [17] and is not disputed by the government.

The examiner denied the motion to recall these witnesses. He did not do so on the ground that the Jencks rule is inapplicable in administrative proceedings. Instead he reviewed the circumstances under which these and other Board witnesses had testified in 1955 and expressed the view that the necessary foundation should have been laid at that time. Accordingly the denial of the motion to recall these witnesses represents an exercise of discretion. The only question here is whether there was an abuse of that discretion.

While the Jencks rule as such had not been judicially or legislatively articulated in 1955, counsel for petitioners vigorously argued for the rule in substance at the 1955 hearings. The examiner rejected the argument at that time but indicated that the matter might be reconsidered. Apparently with this prospect in view, counsel for petitioners proceeded to lay the necessary foundation for application of the rule with respect to several of the Board witnesses. This foundation consisted simply in developing the fact that a report or written statement of the witness relevant to his testimony had been prepared and was in the possession of the Board.

But as to the five Board witnesses here in question, no attempt was made to lay such a foundation except with regard to records of three telephone conversations concerning which Flynn had testified. The examiner construed this difference in the scope of petitioners' examination of Board witnesses as indicating that in 1955 petitioners were not particularly interested in examining the reports and statements of the five Board employees here in question.

It is difficult to account in any other way for this difference in treatment of Board witnesses by counsel for petitioners. If this premise be accepted, the examiner was entitled under all the circumstances to deny the motion to reopen the matter. The hearings were drawing to a close. Two of the five witnesses involved were no longer Board employees. One of them lived in Chicago where no hearing was to be held. Had the recall of these five witnesses led to the production of prehearing reports and statements, new avenues of inquiry might have been opened which would have required the calling of rebuttal witnesses. The time lapse between the original testimony and the request for recall was very substantial. The need to finally bring the protracted case to a close undoubtedly, and justifiably, weighed heavily with the examiner.

In our opinion the examiner did not under these circumstances abuse his discretion in declining to recall these five

17. NLRB v. Adhesive Prod. Corp., 2 Cir., 258 F.2d 403, 408; Communist Party of the United States v. Subversive Activities Control Bd., 102 U.S.App.D.C. 395, 254 F.2d 314, 327–328.

witnesses so that a foundation for application of the Jencks rule might be established.

The examiner ordered production for examination of the pertinent reports and statements as to which a foundation had been laid in the examination of witnesses in 1955. When these were not forthcoming the examiner ordered the testimony of those witnesses stricken. In the case of Flynn the only foundation was in regard to three telephone conversations. When the Board declined to produce the reports as to those conversations, the examiner ordered stricken that part of Flynn's testimony pertaining to the telephone conversations. Petitioners urge that Flynn's entire testimony should have been stricken.

In so far as administrative proceedings are concerned, the Jencks rule is applicable only as a measure of the fundamentals of fair play. It does not seem to us that fair play required that the examiner order the deletion of all of Flynn's testimony. A report limited to three telephone conversations, considered at its worst, would be unlikely to undermine Flynn's testimony on wholly unrelated matters.[18] The foundation having been limited to the telephone conversations, it was not an abuse of discretion for the examiner to limit the sanctions of the rule to the testimony concerning those conversations.[19]

It is next contended that three Board regulations which petitioners were found to have violated are invalid. Such invalidity, it is argued, arises from the fact that these regulations were adopted as amendments to existing regulations by the Board without the adjudicatory proceedings provided in the Administrative Procedure Act, 5 U.S.C.A. § 1004(a) and (b). Adjudicatory proceedings were necessary, it is contended, because the amendments in question had the effect of changing the terms of the existing "licenses" held by Great Lakes and Currey as irregular air carriers.[20]

Great Lakes' authority is based on a letter of registration as a large irregular carrier issued by the Board on August 12, 1947, pursuant to the provisions of part 291 of the Board's Economic Regulations. Currey's authority is based on an individual exemption as an irregular transport carrier issued by the Board on March 16, 1951. In both cases authority was granted pursuant to the power vested in the Board under section 416 of the act, 49 U.S.C.A. § 1386. It is therein provided that the Board may under certain circumstances exempt air carriers from the requirement of obtaining certificates of public convenience and necessity.

On May 5, 1947, which was prior to the time that either Great Lakes or Currey received its authority, the Board adopted former section 292.1 of its Economic Regulations governing the regulation of irregular air carriers.[21] Paragraph (b) of section 292.1 as then adopted provided in part:

"No air carrier shall be deemed to be an irregular air carrier unless the air transportation services offered and performed by it are of such infrequency as to preclude an implication of a uniform pattern or normal consistency of operation between, or within, such designated points."

---

18. After similarly ruling, the Board in its order here under review stated:
"In any event, even if we were to disregard Flynn's testimony in its entirety, there is a wealth of evidence in this record showing knowing and willful violations by respondents of such magnitude as to justify our decision herein."

19. We do not undertake to state how we would decide the point if this were a criminal proceeding.

20. If these evidences of authority held by Great Lakes and Currey are assumed to be "licenses" they were at most temporary and conditional licenses. Great Lakes Airlines, Inc. v. CAB, supra note 14.

21. 12 Fed.Reg. 3076, 3077 (1947) (as amended and recodified, 14 C.F.R. § 291.1 (1956)).

The question to be determined is whether the terms of such authority as thus limited were changed adversely to these petitioners by the subsequent action of the Board in adopting the amendatory regulations to which petitioners call attention. If so, adjudicatory proceedings were necessary, and since none were had the regulations would be invalid at least as to Great Lakes, and a finding of violations could not rest thereon. CAB v. American Air Transp., 91 U.S.App.D.C. 318, 201 F.2d 189, 193.[22]

Petitioners first challenge a part of an interpretation of former section 292.1, adopted by the Board December 10, 1948.[23] The interpretation sets forth a number of illustrative examples of irregular and regular service. Petitioners call particular attention to the eighth example, subparagraph (8) of the interpretation. This example, quoted in the margin,[24] indicates that it was the opinion of the Board that if two or more large irregular air carriers utilized by agreement the services of a single ticket agency, the resulting combined operation would, if frequent and consistent flight service were thereby provided, constitute regular air transportation service by each such carrier.

Secondly, petitioners assert the invalid revision, effective May 20, 1949, of former section 292.1 of the Board's Economic Regulations.[25]

Subparagraph (c) (1) (X) of section 292.1 as originally adopted exempted irregular air carriers from certain provisions of section 408 of the act relating to consolidations, mergers and acquisition of control. Specifically, such carriers were exempted from those provisions of section 408 which made it unlawful, without prior Board approval, (a) for such a carrier or a person controlling it to purchase, lease or contract to operate the properties, or any substantial part thereof, of another irregular air carrier, (b) for any irregular air carrier to consolidate or merge with another irregular air carrier, and (c) for any irregular air carrier or any person controlling it to acquire control of another irregular air carrier. This exemption, however, did not extend to section 408 relationships between irregular air carriers and "any person engaged in any other phase of aeronautics."

Subparagraph (d) of former section 292.1, as amended in May 1949, sets out exemptions available to large irregular carriers (Great Lakes' classification) and contains no exemption as to section 408 of the act. Hence the effect of the May 1949 amendment of former section 292.1 of the Economic Regulations was to make it necessary for carriers such as Great Lakes to thenceforth obtain Board approval prior to entering into control, consolidation and merger arrangements of the kinds referred to above.

22. Since Currey did not receive its individual exemption until 1951, after all the challenged regulations were adopted, it is not clear to us how Currey is in a position to question the validity of the regulations on the ground asserted. But since the Board order could not be sustained if these regulations are invalid as to Great Lakes, we need not determine whether Currey can raise this point. Even as to Great Lakes a question as to one of the regulations is res judicata as noted in footnote 27, infra. We have, however, preferred to deal with the question on the merits.

23. CAB Economic Regulation No. 136, 13 Fed.Reg. 7769 (1948), as recodified, interpretation of part 291 of the Economic Regulations, 14 C.F.R. (1956).

24. "(8) Four Large Irregular Air Carriers agree to utilize the services of a single ticket agency, XYZ Ticket Agency, Inc., with respect to service between points A and B, and to furnish to the agent the dates upon which each will operate between A and B. If the flights, considered in combination, of such carriers between A and B reveal a pattern of operations similar to those shown in example (1) through (7) above, the combination of flights constitute regular air transportation and each such carrier is deemed to be conducting regular operations between A and B."

25. CAB Economic Reg. No. 142, 14 Fed. Reg. 1879, 1881 (1949), as recodified, 14 C.F.R. § 291.15 (1956).

The third regulation which according to petitioners was not validly adopted was an amendment, effective December 10, 1949, of part 291 of the Economic Regulations.[26] In its orginal form part 291 did not require irregular air carriers to supply the Board with data concerning their relations with ticket agencies, brokers and the like. The 1949 amendment of this part added new sections requiring such carriers to file specified information of this kind, established requirements as to the form of tickets sold and prohibited certain agreements between large irregular carriers and ticket agents.

Petitioners argue that with respect to all three of these amendments a question of fact is presented as to whether the amendments changed the terms of Great Lakes' and Currey's operating authority. With this question of fact in mind, at the hearing before the examiner petitioners introduced testimony intended to demonstrate that the practices proscribed in these amendments were generally followed in the irregular air carrier industry prior to the amendments and were essential to its continued economic existence.

This testimony was stricken by the examiner and an offer of proof including the same items was rejected. Petitioners accordingly urge the necessity for a remand with instructions to receive evidence of this kind so that the Board and this court can make a determination as to the validity of the amendments challenged.

If a question of fact were presented as to whether the amendments in question changed the terms of the operating authority of these two carriers, we would agree that evidence relevant to that question should have been received. In that event a remand would be indicated unless it were determined, as urged by the Board, that the order under review is supportable on the basis of other findings not involving the regulations in question.[27]

In our opinion no question of fact was presented because it must be held as a matter of law that the amendments did not change the terms of the operating authority of these carriers. Under their original authority all irregular air carriers were required to offer and perform service of such infrequency as to preclude an implication of a uniform pattern or normal consistency of operation between or within designated points. The specific prohibitions of the amendatory regulations in question were made for purposes of clarification of practices the Board previously considered violative of the purpose and intent of existing regulations with regard to control, consolidation, mergers, and ticket agency arrangements. By more stringent regulations bringing these arrangements under closer Board scrutiny and control, the Board hoped to eliminate widespread violations being practiced indirectly through collective operations.[28]

These matters were within the Board's rule-making powers. See American

---

26. CAB Economic Reg. No. 154, 14 Fed. Reg. 6807 (1949), 14 C.F.R. §§ 291.1(c) (d), 291.23–26 (1956).

27. Such a remand was ordered in CAB v. American Air Transp., 91 U.S.App.D.C. 318, 201 F.2d 189, 194. In that case a different amendatory regulation was under consideration. It was one which provided for the first time a precise limit on the number of irregular trips which a large irregular carrier is permitted to operate.

The Board has heretofore in a different proceeding upheld the validity of the regulations here questioned. Order No. E-9360, July 1, 1955. On appeal from that order the Court of Appeals

for the District of Columbia found it unnecessary to consider the question, finding the order sustainable on the ground of violations of section 401 of the act. North American Airlines v. CAB, 100 U.S.App. D.C. 5, 240 F.2d 867, 873.

The challenged regulations relating to ticket agencies have heretofore been upheld against a similar attack in a proceeding in which Great Lakes was a plaintiff. Arrow Airways v. CAB, Civil No. 4502-50, D.D.C., December 15, 1950. The Board argues, but petitioners deny, that this court action renders the validity of these regulations res judicata as to Great Lakes.

28. The first regulation complained of, which became effective December 10,

Trucking Ass'n v. United States, 344 U.S. 298, 319–320, 73 S.Ct. 307, 97 L.Ed. 337. The regulations were of prospective effect with respect to irregular air carriers generally and had been adopted before the petitioners entered into the alleged combinations and agreements in question. The authority under which these carriers were operating did not insulate them (absent adjudicatory proceedings) from an extension and tightening of Board regulations in an effort to police and enforce limitations already in existence.

This being the legal posture of the regulations, the evidence stricken and refused was irrelevant. It would have shown at most that some carriers were exceeding the authority conferred upon them by the Board. It is immaterial for present purposes whether the irregular air carrier industry should be freed from such regulations in order to prosper.

We hold that the regulations under discussion are not invalid as to Great Lakes and Currey because of their adoption without adjudicatory proceedings.

Petitioners next attack certain factual findings on the ground that they are not supported by substantial evidence.

The three findings so challenged in petitioners' opening brief are that (1) petitioner Irving Hermann obtained control of Currey, (2) Great Lakes, Currey and the Skycoach agencies were subject to common control, and (3) Great Lakes and Currey operated frequently and regularly.

It does not appear that petitioners contend that there was no testimonial or documentary evidence to support these findings. Rather, attack is upon the credibility accorded the testimony of witnesses Malcolm G. Robertson and Milton B. Scott, the examiner's acceptance of testimony given by Bernard B. Azorow in 1955 rather than his inconsistent testimony given two years later, the admission of a recordak copy of a check, the examiner's reliance on certain conclusions in the testimony of witness Scott, reliance on facts outside the record, the alleged action of the examiner in shifting the burden of proof to petitioners, and the sufficiency of the evidence to support the examiner's finding that the individual carriers operated frequent and regular service.

Robertson testified concerning a stock transaction involving Currey and Hermann. The purpose in producing this testimony was to show that Hermann owned Currey. Scott testified concerning negotiations with the Hermanns to obtain the Skycoach advertising account and as to the performance of advertising services for Skycoach. This testimony was produced for the purpose of showing that Great Lakes, Currey and all Skycoach agencies were merged or integrated into a single operating unit.

The Board found no basis for disturbing the examiner's assessment of the credibility of these witnesses nor, acting third-hand in the adjudicatory process, do we. Especially is this so

---

1948, did not purport to be more than an interpretation of the regulation as it existed when Great Lakes received its authority. Hence the real question as to that pronouncement is not as to the manner of its adoption but as to whether it represents a correct construction of the existing regulation. We hold that it does.

The second regulation complained of, which became effective May 20, 1949, did not change the regulations with regard to consolidations, mergers and control as between irregular air carriers and "any person engaged in any other phase of aeronautics." Such arrangements had always been subject to the requirement for prior Board approval. Therefore, in so far as this case is concerned, the 1949 amendment did not affect the rights of Great Lakes and Currey with respect to consolidations, mergers and control as between them and the noncarrier petitioners, all of whom were engaged in "a phase of aeronautics."

The third regulation complained of, made effective December 10, 1949, was adopted to facilitate Board scrutiny and control of arrangements through which carriers were combining with ticket agencies to conduct operations of a type they were unauthorized to conduct individually.

since the testimony of these witnesses concerning particular transactions had considerable corroboration in other testimonial or documentary evidence. But if the particular testimony in question should not have been credited, the fact remains that it was but a small part of the total evidence tending to support the general findings of Hermann's ownership of Currey and of the collective operations of all petitioners.

 Nothing in this record warrants us to criticize the examiner for accepting the testimony given by Azorow in 1955 when the events were fresher in his mind than at the time of his inconsistent testimony in 1957.

 The examiner did not err in receiving in evidence the recordak copy of a bank check.[29] The examiner's reliance on certain conclusions stated by witness Scott, while perhaps inappropriate, was not prejudicial in view of the totality of the evidence supporting the finding of a combined operation.

The facts outside the record on which the examiner relied related to revenue received by the Skycoach agencies and Currey during 1954 and the number of passengers served and passenger miles operated by Currey during that year. The source on which the examiner relied for this information was the complaint in Great Lakes v. Chan Gurney, supra note 2, which contained allegations of this factual data.

 All of these petitioners were plaintiffs in that action and are chargeable with the allegations contained in their complaint. Reliance upon those allegations was not error.[30]

 The examiner did not shift the burden of proof to petitioners. He expressly recognized that there was no original burden of proof upon them. The examiner did, however, express the view that since in his opinion the office of compliance had made a prima facie case it was "incumbent upon * * * [petitioners] to submit documents peculiarly within their custody to show that the indicated financial relationships do not exist." We find nothing inappropriate in this process of reasoning by the examiner in the course of evaluating the evidence and arriving at an ultimate finding.

 In challenging the sufficiency of the evidence to support the finding that the individual carriers operated frequent and regular service, petitioners point to evidence of the average number of flights per month by Great Lakes between New York and Burbank, California. In the fifty-two-month period, September 1, 1952, through December 31, 1956, Great Lakes averaged only 5.2 flights per month between these points. The New York-Burbank route represents the heaviest concentration of flights. Petitioners call attention to the fact that in its Order No. E–9744, issued November 15, 1955, the Board interpreted its frequency restriction to permit eight to twelve flights per month in each direction between two points.

The examiner and Board were not required to base their findings as to frequency and regularity on the time period and flight points utilized in petitioners' computation.[31] The examiner based his ultimate finding as to frequency and regularity of flights on the total data contained in the flight reports filed with the Board and the calendar analysis made of such data. Operations comparable to those found have been held to be clear violations of the restriction against fre-

---

29. United States v. Kushner, 2 Cir., 135 F.2d 668, 674; United States v. Manton, 2 Cir., 107 F.2d 834, 844–845.

30. See Market St. R. R. v. Railroad Comm., 324 U.S. 548, 561–562, 65 S.Ct. 770, 89 L.Ed. 1171; North American

Airlines v. CAB, 100 U.S.App.D.C. 5, 240 F.2d 872, note 18.

31. See Air Transp. Associates, Inc., v. CAB, 91 U.S.App.D.C. 147, 199 F.2d 181, 185–86; CAB v. Modern Air Transp., S.D.N.Y., 81 F.Supp. 803, 805, affirmed, 2 Cir., 179 F.2d 622.

quent and regular service by irregular air carriers.[32]

Petitioners argue that the record does not disclose the number of flights operated by Great Lakes and Currey which were charter flights and hence not "common carrier" flights subject to the limitation as to frequency and regularity. But Great Lakes and Currey were required to specify in their flight reports to the Board any flights claimed to be not includable as common carrier flights. 14 Fed.Reg. 3539 (1949) (as amended, 14 C.F.R. § 242.3(a) (1) (ii) (1956)). The data on which the examiner relied was taken from these reports. Petitioners did not undertake to submit any evidence tending to show errors in the reports or in the data drawn therefrom with regard to the character of the flights.

In our opinion all of the challenged findings of the examiner and Board are supported by substantial evidence.

 Petitioners vigorously attack the manner in which the Board decided this case, arguing that they were thereby deprived of due process of law. It is alleged that while the Board made the ultimate decision, the opinion containing the findings and conclusions was prepared for its adoption by Board employees, that the Board had insufficient time to decide the case, and that the Board did not consider any portion of the record. Based upon these allegations, petitioners contend that (1) the decision is not truly responsive to the evidence, (2) the requirement of an opinion is vitiated "since the Board did not think this case through," and (3) the asserted inversion of decision and findings "makes a complete mockery of the

limited judicial review of agency action." [33]

The examiner's initial decision was issued on January 19, 1959. On February 18, 1959, petitioners filed their exceptions to that decision. Petitioners' brief to the Board was filed on March 27, 1959, and on May 6, 1959, oral argument was had. The case was decided four and a half months later, on September 28, 1959. The Board acknowledges that its opinion was initially prepared by the Board's staff pursuant to the Board's instructions. It denies that it delegated to staff members any responsibility for the determinations evidenced by that opinion.

The chronology recited above discloses that Board members had ample time to review the record and briefs. No statutory provision or judicially pronounced rule precluded them from relying upon subordinates to sift the record, advise as to the contents thereof, and prepare a draft of findings and an opinion for the Board's consideration. See Morgan v. United States, 298 U.S. 468, 481–482, 56 S.Ct. 906, 80 L.Ed. 1288.

It has not been shown that the Board abdicated its deciding function. No circumstance has been alleged which would warrant an inquiry into the internal procedures of the Board in this regard. On September 6, 1960, we denied a motion by petitioners for an order requiring the Board to reopen the administrative proceedings so that evidence bearing upon that point could be received.[34] We adhere to that ruling. See NLRB v. Lane Cotton Mills Co., 5 Cir., 108 F.2d 568.

 Petitioners also contend that the Board's order under review is too broad and vague and prohibits legal con-

---

32. See, e. g., Air Transp. Associates, Inc., v. CAB, supra, note 31; CAB v. Modern Air Transp., 179 F.2d at page 625.

33. Quoting language from Westwood, "The Davis Treatise, Meaning to the Practitioner," 43 Minn.L.Rev. 607, 613. Petitioners' argument on this branch of the case is based in large measure on a

memorandum prepared by Louis J. Hector on September 10, 1959, at the time of the latter's resignation from the Board, which memorandum is to be found in 69 Yale L.J. 931 (May 1960).

34. A request twice denied by the Board in Orders Nos. E–14718 and E–14907, dated December 8, 1959, and February 5, 1960, respectively.

duct, and that the sanctions specified in that order are unduly punitive. In our view these contentions are without merit.

The order is affirmed.